ROBERT W. FAHEY & another[1] vs. ROCKWELL GRAPHIC
SYSTEMS, INC., & another.[2]

Middlesex. November 7, 1984. — August 27, 1985.

Present: GRANT, CUTTER, & WARNER, JJ.

*Negligence,* Manufacturer, Design, Distributor, Printing press. *Uniform
Commercial Code,* Warranty. *Evidence,* Hearsay, Operative words,
Statement obtained from hospitalized person, Relevancy and materiality.

In a personal injury action brought by a pressman against the manufacturer
of a printing press on a theory of negligent design, evidence of the
circumstances in which the pressman had removed a guard from the
press because it was interfering with performance and in which some
three weeks later, as the pressman was attempting to remove a particle
from a plate while the press was operating, his arm was pulled into the
press and crushed required submission of the case to the jury. [647-650]

In an action by a pressman to recover for injuries sustained when his right
arm was pulled into and crushed by a printing press distributed by a
defendant, evidence that the distributor's name appeared, together with
that of the manufacturer, on the label of the press and in literature
describing it was sufficient to warrant a finding that the distributor put
out the press as its own product and, therefore, it was error to direct a
verdict for the defendant on the plaintiff's negligent design theory.
[650-651]

In an action by a pressman to recover for injuries sustained when his right
arm was pulled into and crushed by a printing press, there was sufficient
evidence to preclude a ruling as matter of law that the pressman was
barred from recovery on a breach of warranty theory as a result of his
conduct in removing a guard from the press and, some three weeks later,
in attempting to remove a particle from a plate while the press was
operating. [651-652]

At the trial of an action by a pressman to recover for injuries sustained when
his right arm was crushed in a printing press while he was attempting
to remove a particle from a plate while the press, from which the pressman
had removed a safety guard some three weeks earlier, was operating, the

---

[1] Marie Fahey.

[2] Roland Offsetmaschinenfabrik.

judge erred in excluding statements made by an employee of the distributor of the press, advising the pressman and his assistant to remove the guard and showing them how to do it. [653-655]

General Laws c. 271, § 44, prohibiting use in personal injury litigation of statements made by a hospitalized injured person during the fifteen-day period after the injuries were sustained does not apply to tape-recorded statements. [655-658]

In an action by a pressman to recover on a negligent design theory for injuries sustained when his right arm was crushed by a printing press from which he had removed a safety cover, the judge erred in excluding expert testimony with respect to the feasibility of design of the press with interlocking systems so that the press would not operate with the guard removed. [658]

CIVIL ACTION commenced in the Superior Court Department on September 7, 1979.

The case was tried before *Gerald F. O'Neill, Jr.*, J.

*Andre A. Sansoucy* (*Cynthia J. Cohen* with him) for the plaintiffs.

*Richard K. Donahue* for Rockwell Graphic Systems, Inc.

*John D. Dwyer* for Roland Offsetmaschinenfabrik.

WARNER, J. On January 24, 1977, Robert W. Fahey, a pressman employed by Acme Printing Company (Acme), sustained injuries to his right arm when it was pulled into and crushed by a printing press designed and manufactured by the defendant Roland Offsetmaschinenfabrik (Roland) and distributed by the defendant Rockwell Graphic Systems, Inc. (Rockwell). Fahey and his wife sought damages against Roland and Rockwell on theories of negligent design and breach of warranty[3] and against Rockwell on a theory of negligent instruction. At the close of the plaintiffs' case before a Superior Court jury, the judge directed verdicts for the defendants.[4] The plain-

---

[3] The complaint also included counts seeking to impose "strict liability" in tort. The plaintiffs do not press this theory, nor could they. See *Swartz v. General Motors Corp.*, 375 Mass. 628, 629-631 (1978).

[4] "We take this opportunity to reiterate the principle that the better procedure in a case in which it is a close question whether the standard for granting a directed verdict is met is to allow the matter to go to the jury. If the judge then decides that the jury's verdict cannot stand, a motion for

tiffs appeal from the ensuing judgments, arguing error in the allowance of the motions for directed verdicts and in certain evidentiary rulings.

In reviewing the directed verdicts for the defendants we construe the evidence in the light most favorable to the plaintiffs in order to determine whether "'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff[s].'" *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting from *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972).

We summarize the evidence most favorable to the plaintiffs. As originally designed and manufactured, the printing press was equipped with a guard to protect press operators from a nip point, an in-running juncture between two adjacent cylinders moving in opposite directions. The guard was designed to shield the nip point and automatically stop the press when touched. It was screwed into place and was not designed to be removed for press operation or maintenance. On the day of Fahey's injury, however, the guard was not on the press. It had been removed by Fahey some three weeks earlier.

The guard was affixed to the main frame of the press, an apparently unusual location. On other presses it was attached to the lower unit inker. Although the guard adequately shielded the nip point, its location had the effect of decreasing productivity by interfering with the efficient mounting of press plates. It forced the pressman to stand off-balance while changing plates,[5]

judgment notwithstanding the verdict may be allowed. See *Soares* v. *Lakeville Baseball Camp, Inc.*, 369 Mass. 974, 975 (1976); Mass.R.Civ.P. 50(b), 365 Mass. 814 (1974). This procedure is more efficient than initially allowing a motion for a directed verdict. If the granting of the motion for judgment notwithstanding the verdict is found to be erroneous on appeal, the jury's verdict can be reinstated, while the erroneous granting of the motion for a directed verdict requires a new trial." *Smith* v. *Ariens Co.*, 375 Mass. 620, 627-628 (1978). See *Kalivas* v. *A.J. Felz Co.*, 15 Mass. App. Ct. 482, 486 (1983).

[5] Fahey did not testify that the position of the guard put him in any physical danger, although he did say that it forced him to stand off-balance, creating a "danger" that plates would be ruined during mounting. Michael

and necessitated the efforts of two pressmen for plate mounting when previously one had sufficed. The guard's location also resulted in plate scratching and interference with press greasing. Due to the guard's position, it took half an hour to change plates (make-ready time). By comparison, on a press on which the guard was attached to the lower unit inker that operation took only five minutes. This delay added approximately one hour to each make-ready time, which over the course of a week could amount to five or more additional hours in production time. The result was that Fahey was unable to meet management's expected make-ready time.

Fahey and his assistant pressman, Michael McCorry, alerted Acme to these problems. Fahey similarly complained to Aime Carrier, a Rockwell employee whose duties included installing and servicing presses distributed by Rockwell and instructing pressmen on the operations and functions of the presses. Fahey told Carrier that he wanted to move the guard because its location increased make-ready time and caused scratching on the plates.[6] Later, Carrier notified Rockwell concerning this complaint.[7]

Soon after Fahey's conversation with Carrier, Fahey and McCorry took the guard off the press by removing a number of screws. This procedure, by Fahey's own estimate, took approximately fifteen to twenty minutes. With the guard removed, the nip point between the two cylinders was fully exposed.

Approximately three weeks after removing the guard, Fahey attempted to remove a hickey[8] from a plate with his thumb while the press was in operation. Removing hickies on plates by

McCorry, Fahey's assistant, testified that he thought standing off-balance presented a potential for physical injury to him.

[6] See part 3, *infra*.

[7] Fahey's complaint regarding the location of the guard was not unique. Other purchasers of the same model of the press had lodged similar complaints prior to Fahey's injury.

[8] "Hickies" are particles, such as dirt or dried ink, on a plate which result in flawed prints. Hickies are a common problem in the industry.

this method was a common technique of pressmen.[9] Fahey had used the method "hundreds" of times without incident. While he was attempting to remove the hickey, the nip point caught Fahey's hand, pulling his arm between the cylinders and crushing it. Had the guard been in place at the time of the accident, the nip point would have been inaccessible, and the guard, if touched, would have tripped a switch, shutting down the press.

At the time of his injury, Fahey had been working at Acme for ten years. For three of those years he had been an assistant pressman. Later, he was promoted to the position of pressman and exercised supervisory responsibilities over a press crew. He had been a pressman for four years at the time of his injury. He had, however, worked on this particular type of press for only one month prior to the time he removed the guard.

Fahey knew the danger of an exposed, in-running nip point. He admitted that had the guard been in place, his hand could not have reached the nip point. He recognized that the nip point presented "some danger" but was unaware of the potential for "grave danger" and serious injury. Fahey did not know that his arm would be pulled into the machine and was unaware of the magnitude of harm that would ensue.

Fahey never read any safety bulletin concerning press operations. He could not recall ever having been instructed by his employer regarding safety precautions. He was "generally aware" of posted warnings on the press which, among things, cautioned:

"BE SURE PRESS IS COMPLETELY STOPPED BEFORE TOUCHING ANY OPERATING PART OF THE PRESS."

\*          \*          \*

"ALL GUARDS AND COVERS MUST BE SECURELY LOCKED IN PLACE WHEN PRESS IS IN OPERATION."

---

[9] Although several witnesses testified that removing hickies in this manner was a common practice, it is unclear whether that meant with a handguard in place.

The guard could have been located on the lower unit inker instead of the main press frame. In fact, following Fahey's injury, Rockwell had the guard moved from the main frame to the lower unit inker on both this press and other presses. Attached to the lower unit inker, the guard covered the nip point equally well, increased efficiency, and posed no disadvantage. The guard could also have been equipped with interlocks.[10]

An essential safety design principle of nip point guarding is to make the hazard inaccessible. This involves a recognition that if a guard interferes with a press operator's tasks it is likely to be removed. Whenever possible a guard should be designed so that it cannot be removed, or placed so that there will be no incentive to remove it.

1. *The negligent design theory.* A manufacturer is under a duty to design a machine with reasonable care, *doCanto* v. *Ametek, Inc.,* 367 Mass. 776, 782 (1975); *Uloth* v. *City Tank Corp.,* 376 Mass. 874, 878 (1978), and is held to the standard of an ordinary reasonably prudent designer in like circumstances, *Back* v. *Wickes Corp.,* 375 Mass. 633, 643 (1978). *Pignone* v. *Santa Anita Mfg. Corp.,* 17 Mass. App. Ct. 944 (1983). The product must be designed with reasonable care to eliminate avoidable dangers, *Uloth* v. *City Tank Corp., supra.* See *doCanto* v. *Ametek, Inc., supra.* See also Restatement (Second) of Torts § 398 (1965). It is, therefore, incumbent on the designer to "anticipate the environment in which its product will be used, and . . . design against the reasonably foreseeable risks attending the product's use in that setting." *Bernier* v. *Boston Edison Co.,* 380 Mass. 372, 378 (1980), quoting from *Back* v. *Wickes Corp., supra* at 640-641. *McLeod* v. *White Motor Corp.,* 9 Mass. App. Ct. 132, 135 (1980). This expansive duty reflects a social policy of casting an "increased responsibility upon the manufacturer, who stands in a superior position to recognize and cure defects, for improper conduct in the placement of finished products into the channels of commerce." *Uloth* v. *City Tank Corp., supra* at 881.

---

[10] An interlock is an electrical switch that renders a machine inoperable if a guard is not in place.

Designing a product that functions as intended, is accompanied by warnings, and whose danger is obvious will not necessarily preclude a finding of liability for negligent design. *Ibid*. "[T]here is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery." *Ibid*. In evaluating the adequacy of a product's design, the jury must weigh "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Back* v. *Wickes Corp.*, 375 Mass. at 642, quoting from *Barker* v. *Lull Engr. Co.*, 20 Cal.3d 413, 431 (1978). *Pignone* v. *Santa Anita Mfg. Corp.*, *supra* at 945. See *McLeod* v. *White Motor Corp.*, *supra* at 135-136; *Torre* v. *Harris-Seybold Co.*, 9 Mass. App. Ct. 660, 678 (1980).

The evidence in this case warranted findings that: (1) the placement of the guard significantly increased production time, caused the pressman to stand off-balance while changing plates, resulted in plate scratching and interfered with press greasing; (2) an essential principle of press safety design is a recognition that guards that interfere with pressmen's tasks are likely to be removed; (3) removal of the guard on this press would expose a dangerous nip point; and (4) pressmen commonly remove hickies by hand on operating presses. Thus, there was sufficient evidence to take the case to the jury on the question whether the circumstances of the guard's removal and the plaintiff's subsequent injury were reasonably foreseeable. *Back* v. *Wickes Corp.*, *supra* at 642. See *McLeod* v. *White Motor Corp.*, *supra* at 135.[11]

---

[11] The defendants cite cases from other jurisdictions in which courts have found no liability where injuries resulted following either the removal of a safety device from a product or other alteration of a product destroying the utility of its safety features. In one, the court simply found that the evidence was insufficient to support a conclusion that the alteration was reasonably foreseeable. *Smith* v. *Hobart Mfg. Co.*, 302 F.2d 570 (3d Cir. 1962). Other

There was also sufficient evidence for the jury to determine "the gravity of the danger posed by the challenged design, the likelihood such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Back* v. *Wickes Corp.*, 375 Mass. at 642. First, because the potential injury from the exposed nip point might be serious, it was not necessary that the likelihood of accident be high to warrant the careful design of safety features on the press. See *Bernier* v. *Boston Edison Co.*, 380 Mass. at 379. As to an alternative location for the guard, there was evidence of the feasibility of attaching the guard to the lower unit inker, and evidence that the guard was attached to the lower unit inker on other presses, including the press in question following Fahey's injury. There was evidence that had the guard been attached to the lower unit inker, it would have shielded the nip point equally well, increased productivity, and posed no disadvantage. There was also evidence that the cost of locating the guard on the lower unit inker would have been minimal. As to the issue of interlocks, there was evidence that the guard could have been interlocked, but that a non-defeatable interlocking system would have been complex and would have added "appreciable expense." There was sufficient evidence for the jury to make a "judgment as to the social acceptability of the design." *Bernier* v. *Boston Edison Co.*, *supra* at 382.

The question whether Fahey was contributorily negligent (an issue on which the defendants had the burden of proof),

courts have, as matter of law, characterized product alterations destroying safety features as unforeseeable intervening events, see *Ford Motor Co.* v. *Eads*, 224 Tenn. 473 (1970), or have dismissed the principle of reasonable foreseeability as inapposite where the built-in safety feature of a product is consciously bypassed. See *Hill* v. *General Motors Corp.*, 637 S.W.2d 382 (Mo. App. 1982); *Robinson* v. *Package Mach. Co.*, 49 N.Y.2d 471 (1980). Our cases (discussed in the text) make clear that the question of liability hinges on reasonably foreseeable risks and that that question is almost always for the jury. Accord *Rodrigues* v. *Ripley Indus., Inc.*, 507 F.2d 782 (1st Cir. 1974); *Kuziw* v. *Lake Engr. Co.*, 586 F.2d 33 (7th Cir. 1978); *Thompson* v. *Package Mach. Co.*, 22 Cal.3d 188 (1971); *Cepeda* v. *Cumberland Engr. Co.*, 76 N.J. 152 (1978), overruled on other grounds, *Suter* v. *San Angelo Foundry & Mach. Co.*, 81 N.J. 150 (1979).

thus diminishing or barring recovery, see G. L. c. 231, § 85, was likewise for the jury. That question "is rarely to be taken from the jury and decided as matter of law." *Everett* v. *Bucky Warren, Inc.*, 376 Mass. 280, 289-290 (1978). Although Fahey testified that he knew there was "some danger" in an exposed nip point, and although he admitted that had the guard been in place his hand would not have reached the nip point, he also testified that he did not know that his arm would be pulled into the press and was unaware of the magnitude and gravity of harm that would ensue. Fahey could not recall having been instructed by Acme regarding safety precautions. Questions of credibility were, of course, for the jury. On the question of the reasonableness of Fahey's conduct the jury could also have considered (1) the evidence of the practice of pressmen in removing hickies from moving presses (2) the statements, discussed in part 3 of this opinion, of Rockwell's employee with respect to removal of the guard, and (3) the warnings posted on the press.

For these reasons, there was error in the allowance of Roland's motion for a directed verdict on Fahey's negligent design theory.

Rockwell argues that it cannot be held liable for negligent design because it did not design the press. That argument ignores the rule of Restatement (Second) of Torts § 400 (1965) that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Comment d to § 400 explains that, when an actor appears to be the manufacturer of a product, he "frequently causes the chattel to be used in reliance upon his care in making it. . . . Thus, one puts out a chattel as his own product when he puts it out under his name."

The evidence introduced by the plaintiffs showed the following. Roland manufactured and designed the press. It was labeled a "Miehle-Roland" press. Literature described the press as a "Miehle-Roland" press and extolled in detail the technological advances in press design which it offered. Miehle was a division of and "the same as" Rockwell.

We think the evidence was sufficient to provide a basis for the jury to find that Rockwell put the press out as its own product (at least as a comanufacturer with Roland) and, therefore, to subject Rockwell to liability for negligent design. See and compare *Thornhill* v. *Carpenter-Morton Co.*, 220 Mass. 593, 596-597 (1915) (defendant's representation on product label that it manufactured product taken as "essentially true" although product manufactured by another company), with *Hamson* v. *Standard Grocery Co.*, 328 Mass. 263, 265 (1952) (defendant did not put out product as its own where label identified defendant as distributor). It was error to direct a verdict for Rockwell on Fahey's negligent design theory.

2. *The breach of warranty theory.* Under G. L. c. 106, §§ 2-314 to 2-318, both Roland and Rockwell impliedly warranted that the press was "fit for the ordinary purposes for which such [presses] are used . . . [including] both those uses which [they] intended and those which are reasonably foreseeable"[12] (citations omitted.) *Back* v. *Wickes Corp.*, 375 Mass. at 640. It is now settled that the law of implied warranty in Massachusetts is "congruent in nearly all respects with the principles [strict liability] expressed in Restatement (Second) of Torts § 402A (1965)." *Ibid*. See *Swartz* v. *General Motors Corp.*, 375 Mass. 628, 630 (1978); *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 353 (1983). In deciding the issue of warranty liability "the jury must weigh competing factors much as they would in determining the fault of the defendant in a negligence case. The inquiry focuses on product characteristics rather than on the defendant's conduct, but the nature of the decision is essentially the same. In evaluating the adequacy of a product's design, the jury should consider, among other factors, 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.' " *Back* v. *Wickes Corp.*, *supra* at 642, quoting from *Barker* v. *Lull Engr. Co.*, *supra* at 431.

---

[12] See note 11, *supra*.

We have determined in part 1 of this opinion that there was sufficient evidence to take the case to the jury on design negligence. Under the holding of *Hayes* v. *Ariens*, 391 Mass. 407, 410 (1984) (that a defendant cannot be found to have been negligent without having been in breach of the warranty of merchantability), it follows that there was sufficient evidence to withstand the defendants' motions for directed verdicts on the warranty counts.

The defendants argue that the plaintiffs are barred from recovery for breach of warranty because Fahey's conduct in removing the guard constituted "misuse" of the press and because his subsequent action in touching the moving press was unreasonable. The comparative negligence statute, G. L. c. 231, § 85, does not apply to breach of warranty actions. *Correia* v. *Firestone Tire & Rubber Co., supra* at 354-355. "[T]he only duty imposed on the user is to act reasonably with respect to a product which he knows to be defective and dangerous. . . . [T]he plaintiff in a warranty action under G. L. c. 106, § 2-314, may not recover if it is found that, after discovering the product's defect and being made aware of its danger, he nevertheless proceeded unreasonably to make use of the product and was injured by it. No recovery by the plaintiff shall be diminished on account of any other conduct which might be deemed contributorily negligent" (footnote omitted). *Id.* at 355, 357.

We think the question whether Fahey's conduct barred the plaintiffs' recovery under the rule of *Correia* was for the jury. For the reasons discussed in part 1 of this opinion with respect to the question of Fahey's contributory negligence, we think there was sufficient evidence to preclude a ruling as matter of law that Fahey acted unreasonably with respect to a press which he knew to be defective and dangerous and thus that he was totally barred from recovery for breach of warranty.[13]

---

[13] The *Correia* court reasoned that when a person unreasonably uses a product that he knows to be defective and dangerous "the user's conduct alone is the proximate cause of his injuries, as a matter of law, and recovery

3. *The negligent instruction theory*. In an effort to make out a case of negligent instruction against Rockwell, Fahey sought to introduce evidence of conversations which took place on Acme's premises between Aime Carrier, Rockwell's employee, and Fahey and his assistant, Michael McCorry, and conduct of Carrier related to those conversations. The judge excluded the evidence, explaining that he did so because there was no foundation establishing the reason for Carrier's presence at Acme or of his authority "legally to bind his company [by] admissions." The plaintiffs offered to prove (1) that, when Carrier was told by McCorry that the press crew intended to remove the guard and asked how that could be done, Carrier said the guard could and should be removed and showed McCorry the screws which would have to be removed to do so, and (2) that, when Fahey informed Carrier of the intent to remove the guard, Carrier said that, if he were Fahey, he would do the same thing and pointed out to Fahey the screws which would have to be removed to do so.

The plaintiffs argue that Carrier's extrajudicial statements and conduct were admissible as operative facts of negligent instruction.[14] We agree. Extrajudicial statements offered as the basis of a cause of action or defense, or some part thereof, are admissible as operative facts. Liacos, Massachusetts Evidence 265 (5th ed. 1981 & Supp. 1985). See *Glassman* v. *Barron*, 277 Mass. 376, 382 (1931); *Commonwealth* v. *Leonard*, 352 Mass. 636, 644 n.6 (1967); *Commonwealth* v.

---

is appropriately denied. In short, the user is denied recovery, not because of his contributory negligence or his assumption of the risk but rather because his conduct is the proximate cause of his injuries." 388 Mass. at 356. The court used "unreasonable use" of a defective and dangerous product and "unforeseeable misuse" of such a product interchangeably. In note 15, at 357, the court said that "unforeseeable misuse . . . is most properly analyzed as an element of the plaintiff's case" and not as an affirmative defense. *Hayes* v. *Ariens Co.*, 391 Mass. 407, 410 & n.2 (1984), might be thought to be to the contrary. When read in context, however, and in light of the duty to design only against reasonably foreseeable risks, the cases appear to be in harmony. See *Back* v. *Wickes Corp.*, 375 Mass. at 640-641.

[14] In view of our disposition of this issue, we need not reach the plaintiffs' arguments as to the other bases of admissibility (admission, state of mind, prior inconsistent statement), except to note that none has merit.

*Walter,* 388 Mass. 460, 466 (1983). Such statements are not offered for the truth of the matter asserted but to prove that the statements were made, giving rise to legal rights and duties. See 6 Wigmore, Evidence § 1770 (Chadbourne rev. 1976); McCormick, Evidence § 249, at 732-733 (3d ed. 1984); Hughes, Evidence § 453(1) (1961). Here, the excluded statements were not offered to prove the truth of any matter asserted by Carrier. Indeed, the crux of the plaintiffs' negligent instruction theory was that the substance of Carrier's statements was incorrect, as he misrepresented the advisability of removing the guard. Since Carrier's assertions formed the basis of the plaintiffs' claim, they were admissible as operative facts. Evidence of Carrier's contemporaneous conduct in pointing out the screws to be removed was likewise admissible.

The question whether Carrier's statements and conduct were within the scope of his employment and thus attributable to Rockwell, see Restatement (Second) of Agency § 219 (1958); *Stone* v. *Commonwealth Coal Co.,* 259 Mass. 360, 362-363 (1927); *Vallavanti* v. *Armour & Co.,* 260 Mass. 417, 418 (1927); *Ciarmataro* v. *Adams,* 275 Mass. 521, 527 (1931); *Davis* v. *DelRosso,* 371 Mass. 768, 772 (1977), was for the jury. See *Weiss* v. *Republic Pipe & Supply Corp.,* 335 Mass. 422, 425 (1957); *Davis* v. *DelRosso, supra* at 771. The scope of an employee's employment is not restrictively construed. *Commonwealth* v. *Jerez,* 390 Mass. 456, 461-462 (1983). If the tortious act is within or incident to an employee's authorized duties, the employer is liable even if the employee acted in violation of the employer's instructions. *Stone* v. *Commonwealth Coal Co., supra* at 363. See *Denny* v. *Riverbank Court Hotel Co.,* 282 Mass. 176, 179 (1933); *O'Brien* v. *Freeman,* 299 Mass. 20, 22 (1937). See also Prosser, Torts § 70 (5th ed. 1984). There was sufficient evidence to permit a jury finding that Carrier's statements and conduct were within the scope of his employment. There was evidence of the following. Carrier's specific safety responsibility regarding press guards, orally communicated to him by his superiors during training, was to replace all guards before leaving the customer's premises. This duty included asking the press crew for the guard and installing it or requesting the pressmen to replace it.

Mindful that "[o]nly when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury," *Mullins* v. *Pine Manor College*, 389 Mass. 47, 56 (1983); *O'Malley* v. *Putnam Safe Deposit Vaults, Inc.*, 17 Mass. App. Ct. 332, 341 (1983), we cannot say as matter of law that had evidence of these statements and conduct been admitted, no rational jury could have found Rockwell liable for negligent instruction. Corollary to a manufacturer's or distributor's duty to warn users of "foreseeable latent dangers" in a product's normal and intended use, see *Fiorentino* v. *A.E. Staley Mfg. Co.*, 11 Mass. App. Ct. 428, 433 (1981); *H.P. Hood & Sons* v. *Ford Motor Co.*, 370 Mass. 69, 75 (1976), is the duty to refrain from disseminating incorrect information to users contradicting correct warnings. The posted warning was a caution that all guards must be in place while the press was in operation. Rockwell was under a duty to exercise reasonable care to refrain from issuing opinions and directions encouraging and enabling Fahey to remove the guard in disregard of the posted warning.

With the evidence of Carrier's statements and conduct, there was sufficient evidence to permit the jury to determine whether there was a breach of that duty, as well as whether the harm ultimately incurred by Fahey was proximately caused by the breach. See *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 12 (1983) ("'[Q]uestions of proximate . . . cause are left to the jury'"). We note that although the injury was occasioned by Fahey's deliberate touching of a mounted plate to remove an imperfection while the press was in operation, it was well within the jury's province to evaluate whether Carrier's statements and conduct were a substantial factor in bringing about the injury. See Restatement (Second) of Torts § 435(1) (1965). See also *O'Malley* v. *Putnam Safe Deposit Vaults, Inc., supra* at 342. The question of Fahey's contributory negligence was for the jury. See *Everett* v. *Bucky Warren, Inc.*, 376 Mass. at 289-290.

4. *Other evidentiary questions.* (a) *The use of Fahey's tape-recorded statement.* The judge denied the plaintiffs' motion in limine by which they sought to preclude the admission in

evidence of or reference to a tape-recorded statement given by Fahey seven days after his injury, while hospitalized, to an investigator for Acme's workers' compensation insurer. During cross-examination of Fahey, reference was made to the statement. The plaintiffs argue that denial of the motion and the reference to the statement violated the proscription of G. L. c. 271, § 44, inserted by St. 1950, c. 166, § 1.[15] We consider the question because it is likely to recur at a new trial.

General Laws c. 271, § 44, prohibits the admission in evidence of or reference to written and signed settlements, general releases, and statements made by hospitalized patients within fifteen days of their injuries. The apparent purpose of the statute is to protect persons who might be weakened and vulnerable following injury and treatment and, therefore, unwittingly act against their best legal interests. The plaintiffs contend that, in order to effectuate this legislative purpose, the statute should be read expansively to include tape-recorded statements. Otherwise, the plaintiffs argue, the statute's obvious purpose could easily and intentionally be frustrated. We are constrained to conclude, however, that the Legislature did not intend to include tape-recorded statements within the prohibition of G. L. c. 271, § 44.

---

[15] "Except as provided below, no settlement or general release or statement in writing signed by any person confined in a hospital or sanitarium as a patient with reference to any personal injuries for which said person is confined in said hospital or sanitarium shall be admissible in evidence, used or referred to in any manner at the trial of any action to recover damages for personal injuries or consequential damages, so called, resulting therefrom, which statement, settlement or general release was obtained within fifteen days after the injuries were sustained and such settlement or release shall be null and void unless at least five days prior to the obtaining or procuring of such general release or statement [*sic*] such injured party had signified in writing his willingness that such general release or statement [*sic*] be given. This section shall not apply to statements or releases obtained by police officers or inspectors of motor vehicles in the performance of their duty, members of the family of such person or by or on behalf of his attorney. The provisions of this section shall not apply to chapter one hundred and fifty-two."

We are bound in our construction of § 44 by the statutory definitions set out in G. L. c. 4, § 7, unless a contrary intent clearly appears. Clause Thirty-eighth of § 7 defines "in writing" as including "printing, engraving, lithographing, and any other mode of representing words and letters." See *Assessors of Boston* v. *Neal*, 311 Mass. 192, 194-195 (1942). That clause further provides that "if the written signature of a person is required by law, it shall always be his own handwriting or, if he is unable to write, his mark." See *Irving* v. *Goodimate Co.*, 320 Mass. 454, 458-459 (1946).

We note the Legislature's amendments of comparable statutes as further support for our determination that a signed writing within the meaning of G. L. c. 271, § 44, does not include electronically recorded statements. For instance, G. L. c. 233, § 23A, requiring parties in personal injury actions to furnish copies of statements made by adverse parties upon penalty of exclusion at trial, initially applied only to signed written statements, see *Spellman* v. *Metropolitan Transit Authy.*, 328 Mass. 446 (1952), but was later amended by St. 1964, c. 537, to include statements taken on recording instruments. See 1964 Ann. Survey Mass. Law § 22.3. Similarly, G. L. c. 152, § 7B, which places limitations on the admissibility in workers' compensation proceedings of statements made by claimants to insurers, originally applied only to signed written statements until amended by St. 1968, c. 235, to include "statement[s] taken on a recording instrument."

The Legislature's failure to amend G. L. c. 271, § 44, to include electronically recorded statements may well have been inadvertent.[16] "[I]f the omission was intentional, no court can supply it. If the omission was due to inadvertence, an attempt to supply it . . . would be tantamount to adding to a statute a meaning not intended by the Legislature." *Cole* v. *Brookline Housing Authy.*, 4 Mass. App. Ct. 705, 708 (1976), quoting from *Boylston Water Dist.* v. *Tahanto Regional Sch. Dist.*, 353 Mass. 81, 84 (1967). *Cranberry Realty & Mortgage*

---

[16] The placement of § 44 in a chapter of the General Laws dealing in the main with criminal penalties for various forms of gaming may have provided a secure hiding place.

*Co.* v. *Ackerley Communications, Inc.*, 17 Mass. App. Ct. 255, 257 (1983). "It is the function of the court to construe a statute as written and an event or contingency for which no provision is made does not justify judicial legislation." *First Natl. Bank* v. *Judge Baker Guidance Center*, 13 Mass. App. Ct. 144, 151 (1982), quoting from *Prudential Ins. Co. of America* v. *Boston*, 369 Mass. 542, 547 (1976). See *Sterilite* v. *Continental Cas. Co., ante* 215, 218 (1985). "We are not free simply to add language to a statute for the purpose of 'interpret[ing] [the statute] according to [the Legislature's] perceived objectives.'" *Commonwealth* v. *One 1980 Volvo Auto.*, 388 Mass. 1014, 1015-1016 (1983), quoting from *James J. Welch & Co.* v. *Deputy Commr. of the Div. of Capital Planning & Operations*, 387 Mass. 662, 666 (1982). Accordingly, at a new trial, the tape recorded statement or any reference to it may not be excluded on the basis of G. L. c. 271, § 44.

(b) *Proffered evidence with respect to interlocks.* The judge excluded testimony of the plaintiffs' expert with respect to the feasibility of design of the press with simple or non-defeatable interlocking systems so that the press would not operate with the guard removed. This question is also likely to recur at a new trial. The evidence was relevant to the issue of the availability and feasibility of a safer alternative design, see *Back* v. *Wickes Corp.*, 375 Mass. at 642, and should have been admitted.

5. *Conclusion.* The judgments, except as they relate to counts for "strict liability," are reversed and the case is to stand for a new trial. The evidence, the theories of recovery addressed by the plaintiff, and the distinct rules of law governing the effect of Fahey's conduct on the plaintiffs' recovery seem to us to indicate the wisdom of the submission of the case to a jury on special questions. See Mass.R.Civ.P. 49(a), 365 Mass. 812 (1974). Cf. *McCue* v. *Prudential Ins. Co. of America*, 371 Mass. 659, 666 (1976).

*So ordered.*