Fecteau, J.
Plaintiffs Kevin Lou (“Kevin”), his mother, Beilin Chen, and father, Jidoung Lou (collectively “Lou”) have brought this action against Otis Elevator Company (“Otis”) for injuries sustained by Kevin when he was four years old.[2] While Otis’ original motion for summary judgment had been granted [14 Mass. L. Rptr. 649], the court granted reconsideration of this motion at Lou’s request; Lou served additional affidavits in opposition to Otis’ summary judgment motion, and a new hearing was held on March 28, 2003. Otis subsequently filed a Motion to Strike,[3] which was denied, and renewed its Motion for Summary Judgment. For the reasons set forth below, Otis’ Renewed Motion for Summary Judgment is DENIED.
BACKGROUND
Taken from the record, the following facts are undisputed except as noted. Disputed facts and reasonable inferences therefrom are considered in the light most favorable to the non-moving party. Hub Associates, Inc. v. Goode, 357 Mass. 449, 451 (1970).
Kevin and his parents reside in Worcester County, Massachusetts. In October 1998, while riding down an escalator with his grandmother at the Changzhou Tianyuan Department Store in the People’s Republic of China (“China”), Kevin’s hand became entrapped in and was crushed by the escalator.
Kevin was dragged approximately ten step-lengths to within inches of the comb plate before a security guard manually activated an emergency shut-off switch. When the escalator stopped, Kevin’s right hand was one centimeter away from the comb plate, and his right hand stuck into and squeezed between the stair and the skirt panel. The rescue took one hour and was videotaped by Changzhou TV Studio. As a result of the accident, Kevin’s hand was nearly amputated, and he has undergone several surgeries requiring repeated hospital stays. Kevin continues physical therapy and continues to experience pain from this injury. Since 1978, escalators manufactured or installed in the United States have been required to have skirt obstruction devices, or switches fitted behind the skirt panels, which, when activated by displacement of the skirt panel would open the power circuit to the escalator’s driving machine. These skirt switches were available as an option on this escalator but were not installed. A skirt switch could have automatically shut off the power to the escalator.
Although a 4-millimeter step-to-skirt gap is acceptable in China, a narrower gap appears to be attainable. At the time of the accident, a dent or depression in the skirt panel of approximately 6 millimeters was noted at the location believed to be where Kevin’s hand became entrapped. According to European Standards for safety, escalator skirting should not yield more than 4 millimeters under a single force of 337 pounds. A published government report, “Anthrokids-Hand Measurements”[4] identifies the mean diameter of a 4-year-old male’s finger to be over 10 millimeters. There was no protective device shielding the step-to-skirt gap.
The E510 model escalator at issue was “produced by the Tianjin Otis factory” and sold by China Tianjin Otis Elevator Company, Ltd (“CTOEC”) to the Changzhou Tianyuan Department Store in April 1997. The on-site assembly of the escalator took place between December 1997 and March 1998. Under the terms of its contract with the department store, CTOEC was responsible for “free repair” of the escalator for one year after acceptance of the installation. Although operational in January 1998, the escalator continued to have problems, in particular, abnormal vibration, banging and friction between the steps and the skirt panels. Teams of “Otis maintenance personnel” came frequently to adjust the side gaps and fix the friction, but these problems remained unsolved up to the date of Kevin’s injury. Although Otis had developed, and was using in other countries, a new Teflon_ coated skirt panel that offered a lower coefficient of friction, the subject escalator was equipped with stainless steel skirt panels. Otis ceased using stainless steel skirt panels in North America in 1983.
The Otis trademark name was prominently displayed on the subject escalator: “I have seen news footage of my son being extracted from the escalator . . . The video shows plainly that the name ‘Otis,’ and only that name, appears in large letters on the plate at the foot of the escalator.” Affidavit of Jidoung Lou, par. 14. Otis, a multinational, wholly-owned subsidiary of United Technologies, is incorporated in New Jersey, with a principle place of business in Farmington, and a usual place of business in Worcester, Massachusetts. CTOEC is a limited liability corporation headquartered in Tianjin, China. CTOEC’s Articles of Association dated July 16, 1984,[5] identifies CTOEC as a joint venture made among “Tianjin [(Tianjin’)] . . .; Otis Elevator Company, a corporation of the State of New Jersey, United States... and China International Trust & Investment Corporation” (“CfflC”). In March 1994, Otis contributed an additional $12.3 million to the joint venture, increasing its investment to $78 million and acquiring 51% ownership in CTOEC. Of CTOEC’s ten board of directors, *356 Otis could appoint five, Tianjin could appoint four, and crac could appoint one.
Assistant Secretary and Deputy General Counsel for Otis, An-Ping Hsieh, claims that by “agreement dated March 22, 1994,” Otis transferred its 51% ownership of CTOEC to Otis Far East Holding, Ltd. The referenced March 22, 1994 Agreement of Share Transfer does not confirm that the transfer actually occurred: Otis “may transfer” its 51% ownership of CTOEC to Otis Far East Holding, Ltd, and any such transfers were to become “effective when the 2nd Amendment contract” was approved. The Second Amendment to the Articles of Association, however, continued to list Otis as a 51% owner of CTOEC. Lu Yaning, President of CTOEC, states, in the present tense, that “CTOEC is wholly owned by Otis Elevator (China) Investment Company, Ltd (“OCL”), a holding company established under the laws" of China. Likewise, Hsieh states, “Otis NJ and CTOEC are separate and distinct corporate entities. CTOEC is neither wholly owned nor virtually owned by Otis NJ.” Neither Yaning nor Hsieh affirmatively declare that Otis and CTOEC were separate and distinct entities at the time of the design, manufacture, sale, or installation of the escalator.
In November 1984, CTOEC and Otis also entered into a Technical Cooperation Agreement for the transfer of Otis’ elevator and escalator technology to CTOEC. Otis provided and granted CTOEC “the exclusive right to use Otis’ Know-How” in China. Know-How is defined to mean all: “(a) engineering and product design drawings, data, information; (b) process, production, installation, maintenance, testing, and inspection methods; (c) quality standards; (d) factory and general management methods; and (e) any other data, documents and information owned and furnished by Otis in accordance with the Technical Annex.” In March 1994, the Second Amendment to the joint venture contract modified the TCA “to provide additional high technology to be introduced into CTOEC. Specifically the E510 escalator... technology will be transferred to CTOEC.” Annex 1 to the TCA further describes the scope of the technological transfer. Otis agreed to provide factory renovation assistance such as the acquisition and installation of factory equipment, personnel training, and management assistance including the implementation of a quality control system. Otis agreed to provide engineering assistance for installation, operation and maintenance of the products, as well as personnel training for sales and product installation and maintenance.
By a 1984 Trademark License Agreement, Otis granted CTOEC the “royalty-free right and license within the Territory [China] to use Licensed Name [Otis],” as part of its own name and to use Otis’ “licensed Marks as trademarks” for its escalator and elevator products. The quality of the products carrying Otis’ mark had to be approved by Otis and was subject to quality control inspection by Otis. Advertisement and packaging for the licenced products bearing the Otis mark had to be submitted to Otis for approval.
After the third year, in addition to any profits earned, Otis was entitled to receive a royalty of 2.75% of CTOEC’s total net annual sales as payment for Otis’ Know-How. CTOEC also appointed Otis as “its sole distributor for selling, installing and maintaining Elevator products outside” the territory of China. Distributorship Agreement Outside PRC [People’s Republic of China] Between CTOEC and Otis, § 1.
The technology transfer and licensing agreements between Otis and CTOEC continued beyond 1999, evidenced by the June 1999 Technical Assistance Agreement and License to Use Technical Data, Know-How and Patents Between Otis Elevator Company (NJ) and China Tianjin Otis Elevator Company Limited and the Trademark and Tradename License Agreement.
DISCUSSION
Amotion for summary judgment is appropriate only when the moving party establishes that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c). The moving party who does not bear the burden of proof at trial can meet its initial burden by affirmatively establishing that the non-moving party cannot meet an essential element of its burden at trial, either by negating an essential element of the non-movant’s claim or by demonstrating that the non-moving parly’s evidence is insufficient to establish its claim. Kourouvacalis v. General Motors Corp., 410 Mass. 706, 716 (1991); Girardi v. Gabriel, 38 Mass.App.Ct. 553, 554 (1995). The opposing party must then establish, by setting forth specific facts with affidavits, deposition testimony, answers to interrogatories or admissions, that a genuine issue for trial does exist. Mass.R.Civ.P. 56(e). The reviewing court considers the evidence “ ‘with an indulgence in the [opposing party’s] favor.’ ” Conley v. Massachusetts Bay Transportation Authority, 405 Mass. 168, 173 (1989), quoting Anthony’s Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc., 396 Mass. 818, 822 (1986). All doubt as to the existence of a genuine issue of material fact are resolved against the moving party. Noble v. Goodyear Tire & Rubber Co., 34 Mass.App.Ct. 397, 402 (1993), quoting Correllas v. Viveiros, 410 Mass. 314, 316-17 (1991).
I. Choice of Law
As an initial matter, Otis argues for application of Chinese law to this case, but concedes, “If Chinese law is not applied, then the applicable law should be Massachusetts law.” Although Kevin’s actual injury was sustained in China, his parents’ loss of consortium claims emanate from Kevin’s pain and suffering here in Massachusetts. Massachusetts does not strictly adhere to the doctrine of lex loci delicti,[6] especially when “on the particular facts of a case another juris *357 diction may be more concerned about and more involved with certain issues” than the jurisdiction where the injury was sustained. Cohen v. McDonnell Douglas Corp., 389 Mass. 327, 333 (1983); Pevoski v. Pevoski, 371 Mass. 358, 359-60 (1976). Under the Restatement (Second) of Conflicts of Laws §146 (1971), the laws where the injury occurred would generally apply “unless Massachusetts has a ‘more significant relationship’ to the parties and the occurrence under the considerations provided in §6.”[7] Cosme v. Whitin Machine Works, Inc., 417 Mass. 643, 646-50 (1994).
Based upon the record before the court, Massachusetts clearly has a more significant relationship with the parties in this case than China. There is no evidence that the Chinese government has any particular interest in either Otis or Lou. Indeed, even when a tortious injuiy occurs in China, Article 146 of the General Principles of China’s civil code expressly allows that “(i]f both parties are citizens of the same countiy or have established domicile in another country, the law of their own countiy or the countiy of domicile may be applied.”[8] In light of China’s choice of laws policy, Otis cannot say it has a settled expectation that Chinese law would apply. Further, the judicial task of applying proper legal standards weighs heavily in favor of Massachusetts law; the alternative is not a simple matter of applying the laws of a sister state, but rather, those of a foreign nation. Most significantly, Massachusetts has a stronger public policy interest than China would in this case, both in the compensation of a Massachusetts citizen injured by an allegedly defective product and in holding accountable a United States company doing business in Massachusetts if it is found to be responsible for putting that product into the stream of commerce. See Cosme, 417 Mass, at 648-49. The argument that the Commonwealth’s interests can be met in China is disingenuous because Otis also claims it cannot be reached under Chinese law. Therefore, for the purposes of this summary judgment motion, the court applies Massachusetts law.
II. Product Liability
Lou’s product liability claim is brought under breach of warranty and negligence theories. Regardless of the theoiy, Otis essentially asserts that Lou cannot establish that: (1) Otis bears any liability; (2) the escalator was defective; and (3) the defect caused the injuiy.
A. Liability
A manufacturer is under a duty to design a product with reasonable care to eliminate avoidable dangers. Uloth v. City Tank Corp., 376 Mass. 874, 878 (1978); doCanto v. Ametek, Inc., 367 Mass. 776, 782 (1975). Reasonable care means that the designer should “anticipate the environment in which its product will be used and . . . design against reasonably foreseeable risks attending that product’s use in that setting.” Bernier v. Boston Edison Co., 380 Mass. 372, 378 (1980). “This expansive duty reflects a social policy of casting an ‘increased responsibility upon the manufacturer, who stands in a superior position to recognize and cure defects, for improper conduct in the placement of finished goods into the channels of commerce.’ ” Fahey v. Rockwell Graphics Systems, Inc., 20 Mass.App.Ct. 642, 647 (1985), quoting Uloth 376 Mass, at 881. This duty is not limited to the manufacturer. Carter v. Yardley, 319 Mass. 92, 96 (1946) (“[A] manufacturer or other person owning or controlling a thing that is dangerous in its nature or is in a dangerous condition . . . owes a legal duly to every . . . person [who foreseeably comes into contact with the thing and is ignorant of the danger] to use reasonable care to prevent injuiy to him”).
Liability for breach of warranty governed by the Uniform Commercial Code, G.L.c. 106, §§2-314 to 2-318 is “congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts, §402A (1965) which defines the strict liability of a seller for physical harm to a user or consumer of the seller’s product.” Hayes v. Ariens Co., 391 Mass. 407, 412 (1984) (internal quotations omitted). “[T]he Legislature has imposed duties on merchants as a matter of social policy, and has expressed its intent that this warranty should establish liability as comprehensive as that to be found in other jurisdictions that have adopted the tort of strict product liability.” Commonwealth v. Johnson, 425 Mass. 620, 653 (1997), quoting Back v. Wickes Corp., 375 Mass. 633, 639-40 (1978). The second Restatement of Torts “takes the position that the seller of ‘any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer[.]’ ” Johnson, 425 Mass, at 654, quoting Restatement (Second) of Torts, at §402A(1). “Thus, a claim for breach of the implied warranty of merchantability should be considered in light of the requirements for warranties contained in G.L.c. 106, §§2-314 to 2-318, as well as the principles expressed in §402A of the Restatement.” Id.
Otis argues it has no liability under either theory because it neither manufactured, designed nor sold the escalator. By affidavit, An-Ping Hsieh,[9] the Assistant Secretary and Deputy General Counsel for Otis, claims that “Otis NJ has no offices in China and does not conduct business in China.” Lou disputes this assertion, pointing to Otis’ website at “www.otis.com” wherein Patrick L’Hostis, Otis Vice President and Senior Area Executive for Asia Pacific Area, was quoted as stating that Otis’ newest product “will be manufactured in Otis factories in China, for the domestic market and later for export markets.” Otis’ website further promoted its involvement in China: “Today, Otis has a comprehensive network of branches and service centers to provide product and services directly to customers in eveiy major city in China.” The *358 credibility of such statements are for a jury to determine.
Lou also disputes Otis’ assertion that the escalator was designed in Germany and manufactured in China by corporations that are separate and distinct from the United States Otis, located in New Jersey. Hsieh states:
Otis did not design, manufacture, assemble, install or maintain the escalator. The technology for the model of escalator on which the accident occurred was developed by Otis GMBH & Co. OHG in Stadhagen, Germany. CTOEC manufactured, sold, delivered, installed, and supplied the involved escalator. The escalator was not designed, manufactured or sold in the United States. The escalator was not designed, manufactured or sold by Otis NJ.
Based upon his “research” of unspecified sources, Hsieh’s conclusory statements do not carry Otis’ burden. Polaroid Corp. v. Rollins Environmental Services (NJ), Inc., 416 Mass. 684, 696 (1993) (“bare assertions and conclusions regarding a company officer’s understandings, beliefs and assumptions are not enough to withstand a well-pleaded motion”). Otis’ agreements with CTOEC belie its assertions of total independence from the research, engineering and design of the E510 escalator in China. Further, it is unclear when Otis transferred its majority interest in CTOEC to its holding company, and such doubts are resolved in favor of the nonmoving party. Noble, 34 Mass.App.Ct. at 402, quoting Correllas, 410 Mass, at 316-17.
Lou argues that Otis may also be held liable either as a trademark licensor or based upon its involvement in bringing the defective product into the stream of commerce under §402 of the Restatement (Second) of Torts. See Kasel v. Remington Arms Co., 24 Cal.App.3d 711 (1972). The Third Restatement of Torts provides: “Trademark licensors are liable for harm caused by defective products distributed under the licensor’s trademark or logo [only] when they participate substantially in the design, manufacture, or distribution of the licensee’s product. In these circumstances, they are treated as sellers of the products bearing their trademark.” Restatement (Third) of Torts: Products Liability §14, at 229, comment d. This rule does not apply to a licensor who, without more, simply allows manufacturers to use its name or logo on their products; the licensor must actively participate in the design, manufacture, and/or distribution of the product. Id.
The Appeals Court has accepted that “[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.” Fahey, 20 Mass.App.Ct. at 650, quoting Restatement (Second) of Torts §400 (1965). “Comment d to §400 [of the Restatement] explains that, when an actor appears to be the manufacturer of a product, he ‘frequently causes the chattel to be used in reliance upon his care in making it... Thus, one puts out a chattel as his own product when he puts it out under his name.’ ” Id., quoting Restatement (Second) of Torts §400, comment d. The Supreme Judicial Court has found that “if a defendant’s name is registered as a trademark or is a trade name, the appearance of that name on the product in question is sufficient to identify the defendant as a manufacturer.” Smith v. Ariens Co., 375 Mass. 620 (1978). The Court notes that “the defendant may introduce evidence indicating that it is not the manufacturer of the particular product but the plaintiffs burden of presenting sufficient evidence to identify the defendant as the manufacturer is satisfied by a showing that the name on the product and the defendant’s name are the same.” Id. at 623.[10]
The record shows that Otis’ name was prominently displayed on the E510 escalator, yet Lou does not rely on that fact alone. The E510 escalator was produced by the Otis Tianjin factory and installed by CTOEC. Otis created the joint venture company, CTOEC, in 1984. By 1994, Otis owned up to 51% of CTOEC and had the right to appoint the majority of its Board of Directors. CTOEC had the exclusive right to use Otis’ name and Know-How for the products it manufactured under Otis’ trademark name. Otis’ Know-How included all engineering and product design drawings, data, information, process, production, installation, maintenance, testing and inspection methods and quality standards. Otis had approval rights over the quality, advertisement and packaging for the licensed products bearing the Otis mark. Otis agreed to provide factory renovation assistance such as the acquisition and installation of factory equipment, personnel training and management assistance including the implementation of a quality control system. Otis agreed to provide engineering assistance for installation, operation and maintenance of the products, as well as training for sales and product installation and maintenance. Otis also had an exclusive right to distribute CTOEC’s products outside China.
There is sufficient evidence in the record to establish that a genuine issue for trial exists as to Otis’ liability as either the co-manufacturer, apparent manufacturer, designer, or trademark licensor of the E510 escalator at issue.
B. Defect and Causation
Otis asserts that the plaintiff cannot prove the escalator was defective, arguing, essentially, that the escalator was manufactured, designed and installed according to Chinese standards and codes, Chinese authorities verified that the escalator met these requisite standards when installed, and that under Chinese law, the escalator is presumptively not defective because it was in compliance with the codes and standards.
However, Otis’ evidence is critically flawed. First, Otis presents a translated excerpt from the National Standards of the People’s Republic of China, Code GB *359 16899-1997 (“Code”) entitled, “Safety Rules for the Construction and Installation of Escalators and Passenger Conveyors,”[11] but fails to establish that this Code is relevant to the escalator at issue. In his affidavit, an attorney from China, Jiang Ji-Oh, concedes, “These standards were published on July 2, 1997, and became effective February 1, 1998.” Yet, according to the record, the subject escalator was manufactured and delivered to its final destination by December 1997, and installed before January 22, 1998. According to the Code, the acceptable width of an escalators’ side gap was 4 millimeters. Jiang admits, however, that “(p]rior to the adoption of these standards, there were no legal standards in effect governing the width of the side gaps in escalators. Manufacturers were free to adopt and follow their own standards.”
Next, Otis claims the escalator was examined by the Changzhou Labor Safety and Sanitation Inspection Station and “certified to be in compliance with the Code, including regulations regarding the width of the side gaps between the escalator’s step treads and the skirt panels, neither of which exceed 4 millimeters in width.” Otis submits a translated, one-paragraph excerpt of what it identifies as the Jiangsu Province Escalator Safety Examination Report (On Trial) (“Examination Report”), which, in fact, does not even refer to the Code. Lou objects to the Examination Report as selective, unauthenticated, and incompetent.[12]
Otis does not explain its theory of admissibility, other than to assert that Jiang’s affidavit authenticates the Examination Report as required by Rule 56(e) of the Massachusetts Rules of Civil Procedure. “(R]ule 56(e) provides that affidavits used in support or to oppose a summary judgment motion ‘shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.’ ” Madsen v. Erwin, 395 Mass. 715, 719 (1985), quoting Mass.R.Civ.P. 56(e). Rule 56(e) also requires that “[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.” Mass.R.Civ.P. 56(e). “The requirements of Rule 56(e) are mandatory.” Madsen, 395 Mass, at 719.
Admissibility of foreign official records is governed by Massachusetts Rules of Civil Procedure. Rule 44(a)(2) “establishes the means of proving a foreign document!, which]... if it has been officially published, validates itself. Absent such publication, the rule allows introduction of a copy ‘attested to by a person authorized to make the attestation.’. . . [T]he attestation also requires a certificate.” James W. Smith & Hiller B. Zobel, Rules Practice §44.4, at 123 (1977). See e.g., Verganani v. Guidetti, 308 Mass. 450, 456-57 (1941) (finding admissible a copy of an Italian birth certificate bearing the consular seal of the Vice-Consul of Florence certifying the signatory, with proof that birth certificates are public records under Italian law, and “custodial certification that the copy to be offered in evidence conforms with the original”).
Otis’ argument hinges on a one-paragraph excerpt from an unauthenticated, uncertified Examination Report, which is not attached to an affidavit from the purported escalator inspector. Jiang, an attorney in China, claims that the two pages are “true and accurate copies of a portion of the inspection report prepared by the Chanzou Labor Safety and Sanitation Inspection Station, that I [Jiang] personally obtained, and a translation into English.” (Emphasis added.) The translator is unknown.[13] Jiang did not originate or sign the report, so he cannot personally authenticate it. Nothing shows Jiang to be a person authorized to make the attestation of copies of official Chinese records. Thus, the Examination Report is simply not competent. See Derinza's Case, 229 Mass. 435, 442-44 (1918) (‘There was absolutely nothing beyond the bare production of the copies of the certificates. In the absence of. . . something to show they were entitled to a degree of credence, they were not competent”).
Therefore, Otis fails to meet its initial burden under Rule 56(c) to show by credible evidence that there is no genuine issue of material fact and that it is entitled, as a matter of law, to a judgment. Unless and until Otis’ burden is met, Lou has no burden to produce any evidence of an essential element. Smith v. Massimiano, 414 Mass. 81, 85 (1992). Nonetheless, Lou provides sufficient evidence to demonstrate the existence of genuine issues of material facts on the issues of whether the escalator was defective, and whether that defect caused or exacerbated Kevin’s injury.
“ [T]here is a case for the juiy if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery.” Uloth, 376 Mass, at 881. Lou presents the affidavits of Joseph L. Stabler (“Stabler”), an expert with 27 years of experience in the elevator and escalator field, and Hanmin Wang (“Wang”), who was employed by the Tianyuan Department Store between 1997 and 2000. According to Stabler, although Otis had developed, and was using in other countries, a skirt panel design with lower coefficient of friction due to its “Teflon_ impregnated, hard anodized surface,” the subject escalator was equipped with stainless steel skirt panels. “Otis ceased using stainless steel skirt panels in North America in 1983.” Wang states that the escalators, including the one on which Kevin Lou was injured, continued to experience operating problems, in particular abnormal vibration, banging and friction between the steps and the skirt panels. Enlargements in the gap reoccurred, and “Otis maintenance personnel came frequently ... to fix the friction and adjust the side gaps.”
The record clearly shows that Kevin’s hand was caught and squeezed between the stair and the skirt panel of the escalator. The mean diameter of the finger *360 of a 4-year-old male is more than 10 millimeters, which is obviously and substantially wider than the 4 millimeters that Otis claims was an acceptable standard for the escalator’s side gaps. The record also shows the existence of a dent or depression in the skirt panel of approximately 6 millimeters at the location believed to be where Kevin’s hand became entrapped, and it is reasonably unlikely that Kevin’s soft hand could have created the depression. A side gap of 4 millimeters together with a 6-millimeter depression would create the opportunity for a child’s 10-millimeter finger to become trapped without some type of side gap protective device. In Stabler’s opinion, “the stainless steel skirt panel was more than likely defective when the escalator was assembled and installed . . .” in the department store.
“[Liability will also attach where the design defect enhances the injuries a person sustains in an otherwise foreseeable accident.” Simmons v. Monarch Machine Co., 413 Mass. 205, 212 (1992). Escalators manufactured or installed in the United States were required to have automatic shut-off switches fitted behind the skirt panels, which when activated by displacement of the skirt panel would open the power circuit to the escalator’s driving machine. These switches are simple, low-cost, electromechanical devices that could have automatically shut off the power to the escalator. In Stabler’s opinion, “the injury in this case would have been minimized or prevented altogether had the skirt switches been activated, as these switches typically require depression of only 2.5 mm to activate . . . [and] any deformation of the skirt panel within the location of the switch . . . would stop the escalator . . .” Kevin was dragged some distance toward the comb plate before a security guard was able to manually activate the emergency shut-off switch.
Stabler concludes that to a reasonable degree of professional certainly, it is his opinion “that the failure to design, build and maintain the escalator with appropriate minimal clearance between the skirt panel and the step tread and an effective side gap protection device; . . . [the absence of] emergency skirt switches . . . even at the points required by codes worldwide; and the use of stainless steel skirt panels instead of Otis’ own, more advanced Guardian skirt panel with a lower coefficient of friction, were all likely substantial contributing factors in causing this unfortunate injury-”
As there are genuine issues of material fact on the issues of liability, defect, and causation, summary judgment is not appropriate on the product liability claims under either the negligence or breach of warranty theory.
ORDER
For the foregoing reasons, it is therefore ORDERED that the Defendant’s Renewed Motion for Summary Judgment be DENIED.

In Count I, Lou seeks to hold Otis directly liable for allegedly manufacturing, designing and/or installing the allegedly defective escalator that caused Kevin’s injury, and Counts II and III are for parental loss of consortium. Lou has subsequently withdrawn Count IV, the Chapter 93A claim.

Otis moved to strike the Affidavit of Joseph L. Stabler and the Affidavit of Hanmin Wang.

National Institute of Standards and Technology report entitled, “Anthropometry of Infants, Children, and Youths to Age 18 for Product Safety Design.”

The full Joint Venture Contract, containing Exhibits A (Articles of Association) Through E, the Technical Cooperation Agreement with annexes, and two distributorship agreements are attached to Plaintiffs’ Opposition to Defendant’s Motion for Summary Judgment as Exhibit C. Annex 1 to the Technical Cooperation Agreement is attached as Exhibit D.

The law of the “place of the wrong.” Black’s Law Dictionary 820 (rev. 5th ed. 1979).

Relevant factors provided by the Restatement (Second) of Conflict of Laws §6 are: “(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainly, predictability and urfiforrniiy of result, and (g) ease in the determination and application of the law to be applied.”

A copy of the law is attached to the affidavit of Tahirih V. Lee, a professor of Comparative Law at Florida State University College of Law who specializes in Chinese law.

An-Ping Hsieh’s responsibilities included “maintaining, analyzing and understanding Otis NJ’s records relating to its corporate structure, its legal obligations, duties and responsibilities, and its legal relationships with its parent companies, subsidiaries and affiliates.”

Language in Theos & Sons, Inc. v. Mack Trucks, Inc., that the “mere use of a trademark and other logos of the defendant” does not establish that the defendant cloaked an independent contractor with apparent authority as its agent, is inapplicable to this case. 431 Mass. 736, 746 (2000). Here, Lou seeks to hold Otis directly hable as an apparent manufacturer for personal injury allegedly caused by a defective product bearing Otis’ name.

Otis does not affirmatively state the Code applied to the installation and construction of the subject escalator: “Safety rules for the construction and installation of escalators and passenger conveyors in China were governed at the time of the accident in October 1998 by escalator code GB 16899-1997 (the ‘1997 Code’).”

Lou complains that key information is missing from the excerpted copy provided by Otis, and despite discovery requests, Otis has failed to provide the entire report, which Lou asserts is available from CTOEC. Otis claims not to have the full report in its possession. A party may be responsible for making a good faith effort to produce documents not in its actual possession where sufficient control or rights to obtain them exist. Strom v. American Honda Motor Co., 423 Mass. 330, 337-38, 341-44 (1996). This issue is not addressed because no motion to compel is before this court.

Otis misquotes Jiang as “authenticating the document as ‘a portion of the inspection report . . . that I personally obtained and translated into English.’ ” Jiang does not state that he translated the excerpt into English. Even if he had, he does not demonstrate he is qualified as a translator.