WILLIAM SIMMONS *vs.* MONARCH MACHINE TOOL CO., INC.

Middlesex. February 5, 1992. - July 22, 1992.

Present: LIACOS, C.J., NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Negligence*, Design, Manufacturer. *Evidence*, Expert opinion, Postaccident safety improvements. *Practice, Civil*, Instructions to jury, Conduct of counsel.

In a negligence action against a manufacturer of a bench vise, the evidence warranted the jury's findings that the risk of injury to a person using the vise was reasonably foreseeable in the circumstances [210-212], and that the vise was negligently designed [212].

In a negligence action the testimony of the plaintiff's expert witness was relevant and not speculative. [212-213]

In a negligence action, the jury's verdict was not contrary to the weight of the evidence solely by reason of the differences in the testimony of the parties' expert witnesses. [213-214]

At the trial of a negligence action against the manufacturer of a bench vise, there were no errors in the judge's admitting relevant and competent expert testimony, evidence of postaccident safety improvements on the issue of the feasibility of such improvements, and relevant evidence of the dangerous propensity of the machine in question in similar circumstances; and the judge did not improperly curtail the defendant's cross-examination of the plaintiff. [214-215]

At the trial of a negligence action, the judge did not err in refusing to give requested jury instructions that were redundant or confusing. [215]

In a civil action, the defendant demonstrated no prejudice from the alleged improper conduct of plaintiff's trial counsel. [215]

CIVIL ACTION commenced in the Superior Court Department on March 26, 1984.

The case was tried before *Robert H. Bohn, Jr.*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Terrance J. Hamilton* (*Walter H. Mayo, III*, with him) for the defendant.

*Daniel J. Johnedis* (*Garry V. Inge* with him) for the plaintiff.

LIACOS, C.J. On March 30, 1983, the plaintiff, William Simmons, a machine operator employed by the Raytheon Company, was injured when a tool known as a "tap" ejected from a tool assembly (toolholder) and penetrated his left eye. The circumstances of the accident were as follows. Simmons had been operating a vertical milling machine known as a VMC 150 when he noticed that the cutting tool (tap) in the machine's toolholder had become dull and needed replacement. Simmons removed the toolholder from the VMC 150 and, with the intention of changing the tap, secured the toolholder in a bench vise designed for that purpose. As Simmons began to loosen a nut in the toolholder, the tap ejected upward suddenly. The tap penetrated his left eye, causing a complete and permanent loss of vision in that eye.

Simmons commenced this action on March 26, 1984, naming as defendants the manufacturers of various components of the toolholder as well as the manufacturer of the safety glasses Simmons had been wearing at the time of the accident. Subsequently, Simmons amended his complaint to assert claims of negligence and breach of warranty against the Monarch Machine Tool Co., Inc. (Monarch), the manufacturer of the VMC 150 and the bench vise.[1] Prior to trial, Simmons settled his claims against all defendants except Monarch. Trial commenced on November 13, 1989, and lasted eleven days. Simmons' theory of recovery at trial was that the Monarch bench vise was designed negligently to

---

[1] Simmons' original complaint named the Warner and Swasey Company (the manufacturer of a collet which was a component part of the toolholder) and the H.L. Bouton Company, Inc. (the manufacturer of the safety glasses) as defendants. In March, 1986, Simmons amended his complaint to add as a defendant the Falcon Tool Company, the manufacturer of the outer casing of the toolholder. Falcon filed a third-party complaint against Monarch, and Simmons amended his complaint to assert his claims against Monarch directly.

hold a toolholder with the tap pointed toward the worker's face and because it was not equipped with a safety shield. Monarch's motions for directed verdicts as to the negligence count and the breach of warranty of merchantability count were denied. On November 29, 1989, the jury returned special verdicts for Simmons on both counts and awarded damages in the amount of $1,125,000. Monarch moved for judgment notwithstanding the verdict pursuant to Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974), or, in the alternative, for a new trial pursuant to Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974). The trial judge denied both motions on April 20, 1990, setting forth his reasons for doing so in a thorough memorandum of law.[2] Monarch appealed, and Simmons petitioned this court for direct appellate review.

In this appeal, Monarch argues that the judge erred in denying its motion for judgment notwithstanding the verdict, claiming it had no duty to guard against the possible danger of ejecting taps and because Monarch's vise, standing alone, did not cause the accident. Also, Monarch argues that the judge erred in denying its motion for a new trial because the verdict was against the weight of the evidence, the judge made several erroneous evidentiary rulings, and the judge's jury charge was erroneous. We affirm.[3]

---

[2]Following the denial of its motions for judgment notwithstanding the verdict and for a new trial, Monarch moved to amend the judgment to reflect $416,000 that Simmons had received in his settlements with the other defendants. This motion was allowed, and, on January 31, 1991, the court entered judgment nunc pro tunc reducing the plaintiff's award accordingly. This order is not part of the appeal before us.

[3]Because we find no error on the negligence count, resolution of this case does not require us to discuss Monarch's various claims of error pertaining to the breach of warranty count. We note, however, that most of Monarch's claims of error with regard to the warranty count arise from the judge's instruction which quoted portions of our decision in *Hayes* v. *Ariens Co.*, 391 Mass. 407 (1984). In *Hayes*, we said, "For strict liability purposes, and therefore for purposes of our warranty law, the adequacy of a warning is measured by the warning that would be given at the time of sale by an ordinarily prudent vendor who, at that time, is fully aware of the risks presented by the product. A defendant vendor is held to that standard regardless of the knowledge of risks that he actually had or reasonably should have had when the sale took place. The vendor is presumed

We summarize the evidence presented at trial. The VMC 150 is a vertical milling machine manufactured by Monarch. The machine performs drilling, tapping, and milling functions using a toolholder which fits in the machine's spindle. The toolholder consists of the following component parts: the "tool," which can be either a tap or a drill; a "collet," which is a round collar used to hold the shank of the tool in place; a "collet nut," which is used to tighten the collet around the shank; and the "collet adapter," which is a tapered metal casing into which the component parts are fitted and which in turn fits into the VMC 150. Although Monarch did not manufacture the toolholder or any of its component parts, the exterior of the toolholder was manufactured to Monarch's specifications in order that it would fit into the VMC 150. Although it is not clear whether Monarch supplied the toolholder in Simmons' accident, Monarch had supplied toolholders to Raytheon for use with the VMC 150.[4]

In addition to the VMC 150, Monarch also manufactured and sold to Raytheon a bench vise that was designed as an accessory to the VMC 150. The vise had gear-like teeth

---

to have been fully informed at the time of the sale of all risks. The state of the art is irrelevant, as is the culpability of the defendant. Goods that, from the consumer's perspective, are unreasonably dangerous due to lack of adequate warning, are not fit for the ordinary purposes for which such goods are used regardless of the absence of fault on the vendor's part." Following the lead of two United States District Court judges, see *In re Massachusetts Asbestos Cases*, 639 F. Supp. 1 (D. Mass. 1985); *Collins* v. *Ex-Cell-O Corp.*, 629 F. Supp. 540, 542-543 (D. Mass. 1986), aff'd without opinion, 815 F.2d 691 (1st Cir. 1987), and of the United States Court of Appeals, see *Anderson* v. *Owens-Illinois, Inc.*, 799 F.2d 1 (1st Cir. 1986), Monarch argues that the quoted passage from *Hayes* is not an accurate statement of Massachusetts law. In order to dissipate any confusion on this matter, we take this occasion to emphasize that the quoted language does indeed state Massachusetts law accurately, and, we think, clearly. As we said in *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 355 (1983), in connection with the application of strict liability principles to breach of warranty cases, "the liability issue focuses on whether the product was defective and unreasonably dangerous and not on the conduct of the user or the seller." We adhere to these views.

[4]Monarch also provided Raytheon with a tooling catalogue which Raytheon's tool design engineer would consult in selecting tools for use with the VMC 150.

which could interlock with correlating gear-like teeth on the outer casing of a VMC 150 toolholder. When it became necessary to replace a drill bit or tap, an operator could remove the toolholder from the VMC 150, invert the toolholder, and place the toolholder into the vise where it would be held in place by the interlocking gear-like teeth. The operator could then loosen the collet nut and remove the collet and tap from the toolholder. Simmons was injured while performing this tool change operation.

The plaintiff's expert witness, Dr. David Allen Colling, testified as to his opinion regarding what had caused the tap to eject while Simmons was in the process of removing it. Dr. Colling testified that, in his opinion, the tap was ejected by a combination of compressive and capillary forces that had accumulated in the toolholder while in operation, or "under load," in the VMC 150. According to Dr. Colling, these forces were attributable in part to lubricants between the collet and the tap and in part to the compression of the split rings of the collet around the shank of the tap. Dr. Colling testified that the forces were released when Simmons loosened the collet nut in order to change the tap. Once the forces were released, Dr. Colling testified, the collet and tap rose upward together. The rise of the collet, however, was stopped by a ring on the collet nut. As a result, the remaining forces were transferred into the tap, causing it to eject upward "like a second-stage rocket."

Monarch claimed it had never received any complaints regarding taps ejecting from VMC 150 toolholders prior to Simmons' accident. Several employees at Raytheon, however, had witnessed taps eject, both before and after Simmons' accident. One Raytheon employee, Richard Holsinger, testified that, prior to Simmons' accident, he had worked on the VMC 150 on a daily basis and that he had changed taps on the Monarch vise between ten and fifty times. Holsinger testified that during the tool changing operation "a lot of times the collet would stay jammed inside of the tool holder. And no matter what you did it wouldn't release and you would have to tap the side of it sometimes. And then when this hap-

pened the collet would fly up into the nut and a lot of times ejecting the [tap] straight out of the collet." Holsinger further testified that the farthest he had seen a tap eject was "probably a couple of feet." Another witness, Kevin Bilideau, testified that he had seen taps eject from toolholders on numerous occasions. Once, in 1989, Bilideau had been operating a VMC 150 when he removed the tool assembly and secured it on the Monarch vise in order to change the tap. Bilideau testified that, as he was changing the tool, the tap "shot out and hit me right in the glasses . . . it was a good hit. It wasn't light." Similarly, another witness, Leonard Arsenault, a supervisor at Raytheon, testified that, after Simmons' accident, he recreated the accident and observed a tap eject upward six to eight inches. Finally, another Raytheon employee, Gary Cook, testified that, after the accident, he performed tests to determine whether taps would eject. Cook stated that "sometimes [the tap] would pop up and sometimes it would really fly up and hit the top of the guard [that Raytheon had since installed], and there were all variations of height when it would come up."

Although Monarch had designed its vise as an accessory to the VMC 150, Monarch never conducted any tests to ascertain the risks presented to the worker by the tool changing operation. Moreover, although the vise was designed such that a tool would point toward a worker's face, the vise was not equipped with a shield to protect the worker against ejecting taps. At trial there was evidence that the vise could have been equipped with a safety shield at a cost of approximately $30. There was also evidence that, following Simmons' accident, Raytheon installed a plexiglass shield over the vise and that the shield did not interfere with the vise's function in any significant way.

1. *Monarch's motion for judgment notwithstanding the verdict.* "The standard of review to be employed on a motion for judgment notwithstanding the verdict and a directed verdict is the same . . . ." *Whitehall Co.* v. *Barletta,* 404 Mass 497, 504 (1989). In considering whether the trial judge properly denied Monarch's motion for judgment notwithstanding

the verdict, our inquiry is whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Toubiana* v. *Priestly*, 402 Mass. 84, 85 (1988), quoting *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972).

*Negligent design.* A manufacturer is under a duty to design its product with reasonable care to eliminate avoidable dangers. *Uloth* v. *City Tank Corp.*, 376 Mass. 874, 878 (1978). *Fahey* v. *Rockwell Graphic Sys., Inc.*, 20 Mass. App. Ct. 642, 647 (1985). The manufacturer must anticipate the environment in which the product will be used and design against reasonably foreseeable risks attending the product's use in that setting. *Back* v. *Wickes Corp.*, 375 Mass. 633, 640-641 (1978). The duty is placed on the manufacturer because it stands in a superior position to recognize and cure defects in its product's design. *Uloth, supra* at 881.

In this case, Monarch does not dispute that the bench vise could have been equipped with a shield at minimal cost without interfering with the function of the vise.[5] Moreover, there can be no dispute that a design which points taps which may eject at the face of a worker poses a risk of serious injury. Monarch contends, however, that the risk of ejecting taps was not reasonably foreseeable and that Monarch therefore cannot be held liable for failing to protect against this risk.

The question whether a risk is reasonably foreseeable is almost always a question for the jury. *Fahey* v. *Rockwell Graphic Sys., Inc., supra* at 648-649 n.11. In this case, the jury were warranted in finding that the risk was foreseeable. In addition to the expert testimony, the jury heard testimony from five lay witnesses who indicated they had seen taps eject in similar circumstances during the course of their employment or while attempting to recreate the accident. In light of this testimony, the jury reasonably could have con-

---

[5]There was also evidence at trial that a horizontal design, as opposed to a vertical design, was a feasible alternative. Other vises at Raytheon were designed horizontally.

cluded that Monarch would have discovered the risk if it had tested its product in the environment in which the product was intended to be used. By its own admission, Monarch did not do so.

Monarch has also argued that it cannot be held liable for a design defect in its bench vise because the vise, standing alone, did not cause the plaintiff's injury. We previously have rejected the notion, however, that liability for negligent design is limited to situations where the design defect was the causative factor of an accident. See *Smith* v. *Ariens Co.*, 375 Mass. 620, 624 (1978). Rather, liability will also attach where the design defect enhances the injuries a person sustains in an otherwise foreseeable accident. See *id.* In this case, the jury could well have concluded that the Monarch bench vise significantly enhanced the risk posed by the tendency of toolholders to eject their taps, and that the vise was negligently designed.

Finally, Monarch has argued that the plaintiff's evidence was insufficient as matter of law to establish negligence because the testimony of Dr. Colling as to what had caused the tap to eject was speculative. In particular, Monarch points out that Dr. Colling had not measured the actual force that was necessary to cause a tap to eject and that Dr. Colling did not know the size or specifications of the collet or tap involved in the accident. Relying on *Goffredo* v. *Mercedes-Benz Truck Co.*, 402 Mass. 97 (1988), Monarch argues that the lack of such essential information rendered Dr. Colling's testimony speculative and therefore without evidential value. In taking this position, Monarch fails to acknowledge that Dr. Colling's expertise was established and that his opinion testimony was not only relevant but well within the area of his expertise and the evidence admitted. Even if we accept the defendant's emphasis on the fact that Dr. Colling did not know the dimensions of the particular tap and collet involved, the argument misses the mark in that it ignores the evidence that taps of the same type had ejected on other occasions, and that compressive and capillary forces could cause such occurrences. The testimony was not speculative.

Additionally, the defendant's argument is flawed because it assumes that Dr. Colling's testimony as to what caused the tap to eject was essential to the plaintiff's theory of recovery at trial. The plaintiff was not attempting to hold Monarch liable for a design defect in the toolholder itself. For this reason, Monarch's reliance on *Goffredo, supra,* is misplaced.[6]

2. *Motion for a new trial.* In support of its motion for a new trial, Monarch argues that the verdict was against the weight of the evidence, that the judge made several erroneous evidentiary rulings, that the judge's charge was defective, and that a new trial is required due to an alleged impropriety in the conduct of plaintiff's counsel. We address each claim of error briefly.

a. *Weight of the evidence.* In arguing that the verdict was against the weight of the evidence, Monarch essentially asks us to adopt the testimony of its expert witness, Robert Holt, who testified that it was physically impossible for a tap to eject in the manner the plaintiff described. Monarch argues that because Holt had measured the maximum amount of force that could accumulate in a toolholder while "under load" and because he determined that the furthest a tap could eject was approximately three inches, his testimony weighed heavier than that of the "speculative" testimony of the plaintiff's expert, Dr. Colling.

We need not weigh Holt's testimony against that of Dr. Colling. The question of credibility of an expert is for the jury, not for a judge. We do not view the jury's assessment of the conflicting expert testimony as being contrary to the weight of the evidence on the relevant issue of negligent design of the bench vise. Additionally, the jury were entitled to consider the testimony of the other workers at Raytheon who had seen taps eject as far as a couple of feet. In light of this testimony, as well as the other evidence in the case, the jury

---

[6] We note that no challenge to Dr. Colling's expert qualifications was made nor was any motion to strike the testimony now complained of made by the defendants.

reasonably could have concluded that Holt's opinion was not credible.

b. *Evidentiary rulings.* Monarch contends that the judge erred in allowing Dr. Colling's testimony as to what had caused the tap to eject because the testimony was irrelevant and scientifically unsound. We reject these arguments for the reasons already stated.

Monarch also argues that the judge erred in admitting evidence that, after Simmons' accident, Raytheon equipped the Monarch bench vise with a plexiglass shield. There was no error. "[E]vidence of a post-accident improvement may be admissible, in the judge's discretion and subject to limiting instructions . . . to prove the practical possibility of making a safety improvement." *doCanto* v. *Ametek, Inc.*, 367 Mass. 776, 780 (1975). Here the judge admitted the evidence on the question of feasibility of an alternative design and appropriately instructed the jury regarding the limited purpose for which the evidence was admitted. That the feasibility of the alternative design was not disputed by Monarch did not render the evidence inadmissible. *Id.* at 781 ("In the judge's discretion, evidence, otherwise admissible, does not lose that status simply because of a general concession made by the party against whom that evidence is offered").

Monarch's claim that the judge erred in allowing other Raytheon employees to testify that they had seen taps eject is also without merit. The evidence was relevant to the question whether the taps had a propensity to eject under similar circumstances. Evidence of the recent behavior of machinery under similar circumstances may be admitted in the sound discretion of the trial judge. See *Edward Rose Co.* v. *Globe & Rutgers Fire Ins. Co.*, 262 Mass. 469, 472 (1928). Additionally, such evidence was relevant to refute the claim of the defendant's expert that such an accident could not happen in the way claimed by the plaintiff.

Finally, we reject Monarch's claim that the judge erred in curtailing Monarch's cross-examination of the plaintiff regarding his use of his safety glasses. Monarch was permitted to pursue the line of questioning exhaustively, even to the

point where defense counsel conceded that he "didn't want to beat a dead horse." The judge acted well within his discretion in requesting that counsel cease doing so.

c. *Jury instructions.* The judge refused to give the defendant's requested instruction to the effect that the mere happening of an accident is not evidence of negligence. The judge did, however, charge the jury that, "[i]f the defendant acted with reasonable care under the circumstances, then it is not negligent and not liable to the plaintiff even though the plaintiff might have been injured." In light of the instruction actually given by the judge, we agree with the judge's ruling that the requested instruction was redundant.

Similarly the judge properly refused to instruct the jury that Monarch's duty of care did not extend to the component parts of the toolholder. The requested instructions were foreign to the plaintiff's theory of recovery at trial and, as such, the trial judge properly concluded that the instructions would have served only to confuse the jury.

d. *Conduct of trial counsel.* Finally, Monarch argues that the plaintiff's trial counsel violated Supreme Judicial Court Rule 3:07, Canon 7, DR 7-106, as appearing in 382 Mass. 784 (1981), by persisting in a line of questioning as to whether Monarch's counsel had also represented Raytheon despite the judge's admonition that the question was not relevant. Plaintiff's counsel originally asked the question on the second day of trial and, after the defendant's objection was sustained, plaintiff's counsel repeated the question only once, on the eighth day of trial, during cross-examination of a different witness. We fail to see how Monarch was prejudiced in any manner by the question, as the subject matter was collateral to any issue at trial.

*Orders affirmed.*
*Judgment affirmed.*