Hershfang, J.
This case concerns the sometimes sticky question of whether and what kind of expert testimony is necessary to support a finding of breach of warranty. Here, the supplier of a bicycle’s handlebar assembly that failed three years after its purchase claims that the expert testimony supporting plaintiff’s claim was deficient. While the answer is far from obvious, we agree.
From the reported evidence[1] viewed most favorably to plaintiff, Goffredo v. Mercedes-Benz Truck Co., Inc., 402 Mass. 97, 98 (1988), we learn the following.
In June, 1985, Ann Bruno bought her three-speed Columbia bicycle at Lechmere Sales in Cambridge. When shipped by Columbia Manufacturing Company (Columbia) it was partially assembled. Lechmere staff put together the rest, most notably for our purposes by attaching the handlebar stem to the bicycle’s frame. HKK Chain Corp. of America (HKK) had supplied that handlebar package to Columbia; it had been manufactured elsewhere.
We are not told just how or how often Ann Bruno used that bicycle for the next three years or until July 8,1988. Nor are we told whether or how often it was serviced. We are told that in the wintertime after Ms. Bruno and her husband moved to a Boston waterfront complex she stored it down in the bicycle room.
We learn, also, that Ann Bruno has no memory of any accident with her bicycle before July, 1988, in which its handlebars “sustained trauma to either side.” She did recall what she describes as a “minor incident” in 1985. On a rainy day “the bicycle skidded,” she fell sideways but didn’t remember “any specific injury to the handlebars.” Only when pressed on cross-examination did she allow for the possibility the bicycle did hit the ground. That incident caused her no injury.
On Friday, July 8,1988, before going to work, at about 6:30 to 7:00 a.m., Ms. Bruno was bicycling for exercise along the Charles River on the Esplanade in Boston. The weather was beautiful. The bicycle was problem-free (“fine”). On her return, while trav-elling five or six miles per hour, the bicycle’s handlebar assembly “flopped” in Ann Bruno’s hands, leaving her with no means of controlling the bicycle. Instinctively she jammed her feet into the ground, “jounced back and forth a couple of times” until she could stop the bike about a foot or foot-and-a-half later. Both Bruno and the bike toppled to the right, but neither fell to the ground. Jamming her feet on the ground caused Bruno *138 pain, beginning with an “accordion type ache” in her lower back, continuing with every “jounce.”
James Bruno, plaintiff’s husband, testified he was present at Lechmere Sales when his wife in 1985 had purchased the bicycle, and Lechmere’s personnel assembled it “right there and then.”
Claiming serious injuries resulting from the incident, in May, 1991, Ann Bruno filed suit in the Superior Court against the seller, Lechmere, Inc. (Lechmere), the manufacturer, Columbia, and two of the suppliers to the manufacturers, MTD Products, Inc. (MTD) and Wald Manufacturing Company, Inc. (Wald). The complaint against Wald was later dismissed by stipulation. Columbia filed a third-party claim against HKK alleging indemnification. The case was then remanded to this court.
During trial, two theories of how the handlebar stem of the bicycle failed were offered by the parties. The first was plaintiff’s. To establish liability by connecting the failure of the handlebar stem to one or more deficiencies in the manufacture or assembly of the bicycle or its parts, or to the negligence of Lechmere or one or more in the chain of sellers, Bruno called on James A. Ruth, a metallurgist. Ruth had examined the handlebars and the stem using a scanning electron microscope. He had examined and evaluated the fracture surfaces. He had also measured the hardness of the steel and prepared a cross section “through some of the cracks and the main fracture.” He testified that, as a result, he was able to identify “the fracture origin” which had a number of secondary cracks around it. His examination of the bolt which connected the stem to the mainframe of the bicycle revealed some stripped threads. This suggested to Ruth that there had been difficulty in tightening the nut onto the bolt and that the harder nut deformed the softer threads. The stripped bolt which “won’t stay tight” was within a half-inch of the fracture origin. According to Ruth, the fracture originated in the center of the handlebar and ran to each side. However, the structure of the steel appeared sound.
From his examination and based on his background and experience, Ruth concluded that the handlebar stem failure was traceable to its assembly at Lechmere, when the stem of the handlebar was connected to the bicycle’s frame. Because of difficulty in tightening the nut to the bolt, the harder nut had deformed the softer threads, causing them to become “stripped.” In Ruth’s view, the head of the bolt was then hammered down further into the square head to engage the nut on threads beyond the stripped area. In doing so, accidentally the top of the stem was struck and became indented a half-inch above the hole into which the bolt went. A fracture began at the impact location in the center of the handlebar and ran to each side.
In Ruth’s examination, helped as noted by an electron microscope, he found no evidence that the handlebar material itself had anything to do with plaintiff’s accident.
The handlebar system HKK sold to Columbia was one of about forty-five thousand which Columbia had purchased from HKK in the three years before Ann Bruno bought her bicycle. There was no evidence of any other handlebar failure.
Thus, plaintiff’s theory of liability seems to have been that Lechmere personnel were negligent in connecting the handlebar assembly to the bicycle frame. The hammering of the nut to override the stripped threads caused a fracture which, over time, spread across the handlebar unit causing it collapse. That negligent action on the part of Lechmere’s staff arguably was foreseeable and, thus, Columbia and the supplier could be held responsible. See, Solimene v. B. Grauel & Co., KG, 399 Mass. 790, 796 (1987) (in general, tortfeasor liable for foreseeable intervening conduct of third party whether that conduct negligent or not).
The second theory of the handlebar stem failure was advanced in its defense by Columbia. It produced Robert C. Azar, professor and chairman of the Department of Mechanical Engineering at Western New England College in Springfield, Massachusetts. He had examined the bicycle in July, 1992, seven years after its purchase and four years after its handlebar stem was fractured. The handlebars were then in a vertical as opposed to the normal, horizontal, position. Almost one turn of the thread, or about *139 22%, was stripped. However, in contrast to Ruth, Azar concluded that the stripping of the thread was simply the result of the normal bicycle handlebar’s being worked back and forth, “where a person is peddling the bike and they [sic] are also applying alternate up and down forces to the handlebar grips.” It would not surprise Azar to “see bolts that are tightened to a sufficient torque take on that type of appearance over a lengthy period of time.”
Azar’s was an entirely visual inspection, with particular attention to the stem itself and the handlebar.
Then how or why did the handlebar system fail? In Azar’s opinion a pre-existing crack had been caused by an earlier impact to the handlebar. A small crack on the left of the handlebar over time progressed to the right when, with just a little portion of the stem remaining intact, it finally gave way. Azar inferred from a dent on the left side of the handlebar that the bicycle had “probably” fallen to the ground and that part of the handlebar had struck the pavement with sufficient intensity to dent it and bruise the chrome plating. The crack reflected, or spread, back to the edge of the clamp. Azar also noted two “severe gouges” where the edges of the clamp would meet when attached to the handlebar, further evidence of the high stresses on the edge.
In short, Azar’s opinion was that some unspecified prior event(s?) caused damage to the left side of the handlebar. In turn, the force extended across the handlebar to the clamp assembly causing a crack on the left side. Over time that crack, which Azar claims would have been visible to Ms. Bruno, travelled across to the right side, causing the clamp eventually to fail.
Azar testified that he had worked on about ninety cases for Columbia in which some claim of defect was made. There may have been two or three involving a part he thought substandard. However, there is no testimony about any prior handlebar failure.
The trial judge was thus presented with three choices. First was Ruth’s view that the handlebar stem failed because of Lechmere staff’s negligence. Second was Azar’s view - - the bicycle must have fallen on its handlebar. Third was that plaintiff had failed to establish that any of the defendants had been negligent or broken any warranty of merchantability. The trial judge adopted Azar’s opinion.
Although the trial judge made no specific finding on the various plaintiff’s claims, from the transcript we learn that judgment for plaintiff was based not on any finding of negligence, but solely on a finding of a breach of warranty of merchantability; the handlebar system was defective because, relying on Azar’s testimony, it did not withstand a “foreseeable” but not otherwise described “reasonable” force. The judge’s conclusion appears to have resulted from his answer to his rhetorical question: If not a defect, how did it happen?[2] Judgment was entered against all defendants. In the third party claim of Columbia, judgment entered against HKK.
The appellant, HKK, the supplier of the handlebar system, raises two basic *140 arguments:[3]
First, by appropriate requests for rulings which the judge denied, HKK questions the sufficiency of evidence.
Second, by appealing the allowance of Columbia’s appropriate request for a ruling on the issue, HKK contests its liability on Columbia’s indemnity claim.
The Sufficiency of Evidence
HKK’s basic claim is that absent specific expert testimony the “flopping” of the handlebar and the consequent personal injury to Ms. Bruno cannot be connected with the bicycle’s design, manufacture or any deficiency in the assembly. Or, put differently, that HKK cannot be found to have breached its warranty of merchantability without expert testimony of “the precise nature of the alleged defect and [its] causal relation” to plaintiff’s accident. Goffredo v. Mercedes-Benz Truck Co., Inc., Mass. 97, 103, (1988) (expert opinion not sought until four-and-a-half years after the accident and based in part on assumptions as to force and distance expert could not measure — only that they were “sufficient” to cause truck door to open — inadequate to establish breach of warranty).
Columbia, however, claims that a bicycle is a simple mechanism the collapse of whose handlebar requires no expert testimony. Cf., Coyne v. John S. Tilley, Co., Inc., 368 Mass. 230, 235 (1975) (can infer as matter of common knowledge that newish aluminum step ladder would not when being used collapse inward at forty-five degree angle unless someone had been negligent). In short, Columbia equates the collapsed handlebar with the collapsed ladder, neither requiring expert testimony. Id. See, too, Richard v. American Manufacturing Co., Inc., 21 Mass. App. Ct. 967 (1986) (bag-bundling press manufacturer liable without need for specific expert testimony) and Collins v. Sears, Roebuck & Co., 31 Mass. App. 961, 962 (1992) (supplier of electric clothesdryer which caught fire two-and-a-half years after purchase and although moved and installed elsewhere liable without expert testimony of exact nature of defect). Moreover, Columbia maintains that if expert testimony is required, Azar, a professor of engineering, provided it here.
Finally, in disagreeing that the expert testimony of the kind HKK claims Azar provided here is inadequate, and more particularized expert testimony is necessary, Columbia refers us to DoCanto v. Ametek, Inc., 367 Mass. 776, 782 (1975) (jury may rely on lay knowledge in finding negligent design of a laundry ironing machine whose safety mechanism, which shut off power to the machine, did not keep the machine from continuing to coast, or “overtravel,” at a high speed, crippling plaintiff’s hand; jury also heard evidence that the triggering safety mechanism design had been corrected in later models). Columbia also cites Smith v. Ariens, Co., 375 Mass. 620, 625 (1978) (no need for expert testimony to find snowmobile manufacturer liable for designing brake brackets whose protruding parts caused injury)
We are grateful that it is not our task to reconcile the logic or result in the various “product failure” cases cited and relied upon by the opposing parties here. Those cases, and others that have attracted our attention, seem more or less to fall among a broad, some might say disordered, spectrum.
However, several factors in this case persuade us that the failed handlebar here is not like what Bruno wants us to equate with the case of the failed ladder. Instead, we conclude that, first, Bruno cannot recover without expert testimony and, second, that Azar’s testimony is inadequate.
Because the collapsed handlebar appears on its face similar, we turn first to the col *141 lapsed ladder case, Coyne v. John S. Tilley Co. Inc., 368 Mass. 230 (1975). Bruno takes comfort from and urges us to follow what is the dictum in that case, namely, that common knowledge without expert testimony is an adequate basis for inferring that the ladder failed because “someone had been negligent.” Id., at 235.
In fact, however, a finding for plaintiff in Coyne following a bench trial in this court was vacated by our Appellate Division, and its reversal of the trial judge’s ruling was upheld on appeal. In the claim against the ladder’s manufacturer, the Supreme Judicial Court says much of relevance to our case:
Plainly, a properly fabricated and designed aluminum ladder which had received proper care and usage would not collapse if put to the use for which it was intended. See, Jiminez v. Sears, Roebuck & Co., 4 Cal.3d 379, 387 (1971). There are numerous conceivable acts of negligence which might have contributed to the collapse: A leg of the ladder might have been constructed with defective materials and then inadequately tested by the manufacturer. The ladder might not have been designed to support a load which the manufacturer should reasonably have expected the ladder to hold. The ladder might have been mishandled by a middleman in the distribution process. At the time of the accident, a leg of the ladder might have been positioned in such a way that it could not withstand the weight applied, or, in the alternative, the weight applied might have been excessive when considered in light of the ladder’s manifest construction and design. In any event, the likelihood that the collapse was caused by some negligent act could be found to be greater than that it was not. Just as in the case of a mysteriously exploding bottle (See Evangelio v. Metropolitan Bottling Co. Inc., supra) or a mysteriously malfunctioning automobile transmission (See LeBlanc v. Ford Motor Co., 346 Mass. 225 [1963]), the occurrence of this accident will support an inference of negligence, [footnote omitted]
However, the above mentioned inference alone will not support a finding for the plaintiff in the instant case. ‘Where, as here, the accident occurs after the defendant has surrendered control of the instrumentality involved, it is incumbent upon the plaintiff to show that the instrumentality had not been improperly handled by himself or by intermediate handlers.’ Evangelio v. Metropolitan Bottling Co. Inc., 339 Mass. 177, 183 (1959). Rafferty v. Hull Brewing Co., 350 Mass. 359, 363 (1966). The evidence introduced must be of such a nature that it warrants a reasonable inference that the particular defendant-manufacturer, rather than another, bears responsibility for the negligence which, one may infer, caused the accident, [citation omitted] Id., 368 Mass at pp. 235-238.
Plaintiff in Coyne was found on appeal to have failed that test. “[H]is evidence was insufficient to exclude his own actions as a cause for the ladder’s collapse.” Id., at 238. Thus, at the least, that case, which involved no expert, does not support Columbia’s claim that it can establish HKK’s liability here even without expert testimony.
Moreover, in Coyne “[t]he trier of fact could deem it improbable that a ladder which appeared bright, new and defect-free to [intermediate] observers had been damaged significantly by handling between the time it left the manufacturer’s control and the time of the plaintiff’s use.” Id., at 237. Here, of course, the opposite is true. Thus, Azar’s view of the damaged bicycle -- “severe gouges,” “dent,” “rust” and “crack” - serve as the very basis of his conclusion that the bicycle failed because of one or more events after it left the manufacturer’s control and while in, if not because of, Bruno’s use. In this respect, where the damage due to use or abuse is obvious, this handlebar case is markedly different from other cases Bruno asks us to follow. See, e.g., Richard v. American Manufacturing Co., Inc., 21 Mass. App. Ct. 967 (1986) (bag bundling press manufacturer is liable without need for specific expert testimony), and Collins v. Sears, Roebuck & Co., 31 Mass. App. Ct. 961, 962 (1992) (ditto, with respect to manufacturers of electric *142 clothesdryer).
We now turn to Azar’s opinion. We refer to his actual relevant testimony.
From the bicycle’s physical appearance seven years after its purchase, and viewing it by naked eye only, Azar observed that there was a dent in the handlebar with some rust. That condition “indicated that at some time prior to this accident the handlebar ... the bicycle probably fell to the ground and this portion of the handlebar struck the pavement sufficiently to put a dent in the handlebar and the chrome plating” which, over time, spread, or, as Azar testified, “propagated over the next weeks, months or even years” (emphasis added). Azar says the “crack” would have been visible to plaintiff, but she did not testify she saw it.[4]
Is Azar’s testimony adequate? We believe not. While, as noted, there seems no clear path to follow in “product failure” cases, they do reflect significant signposts that guide us here. First is the length of time from the product’s acquisition and the nature of its use until its failure. Obviously, at least in general, the longer the time span and the harder the use the greater the likelihood of mischief for which the manufacturer and supplier ought not be liable. Cf., Collins v. Sears, Roebuck & Co., 31 Mass. App. Ct. 961, 962 (1992) (supplier of electric clothesdryer which caught fire two-and-a-half years after purchase liable even though dryer moved and installed elsewhere). Here, more than three years passed from the purchase of the bicycle to the date of its handlebar stem failure. We are told almost nothing of possible relevance to that failure during that period except, possibly, that in its first year, 1985, it was involved in a skidding incident (about which Ann Bruno had first testified it had not hit the ground). We also have Ruth’s and Azar’s testimony about their after-the-accident inspection of the handlebar and stem’s prior physical condition, including the existence of a dent, rust, gouges and a crack. The only testimony about its material structure, from Ruth, was that it was sound. Thus, at the least, we know that after Ann Bmno used the bicycle for three years, it was not at all like the ladder in Coyne v. John S. Tilley Co., Inc., 368 Mass. 230, 237 (1975), “bright, new and defect free.”
Second is that a maker or supplier of a product may be liable for breach of warranty of merchantability only with respect to reasonably foreseeable risks of the product’s expected use. See, Simmons v. Monarch Machine Tool Co., 413 Mass. 205, 211 (1992) (manufacturer must anticipate environment in which product will be used and design against reasonably foreseeable risks attending product’s use in that setting). For this reason, HKK would not have to anticipate or be responsible for the bicycle’s falling from the Empire State Building or its being subject to an equally brutal pounding by someone seeking to do it in while the bicycle was stored in the basement of Bruno’s building. As to possible alternative causes, compare, Coyne v. John S. Tilley Co., Inc., supra. It is for this reason that, in argument, Columbia’s attorney characterizes as “foreseeable” the incident(s) of the bicycle’s “probable” fall on which Azar bases his opinion. But not only does Azar not testify to the foreseeability of whatever event(s) in which the bicycle “probably” fell and were damaged enough to cause the eventual collapse of the handlebar, there is no evidentiary basis for that “leap.” Indeed, in the face of the tens of thousands of handlebar systems HKK shipped in the three years preceding Ann Bruno’s purchase of the bicycle involved here with no evidence any had suffered a failure, there is every reason to be skeptical of such a claim.
Finally, not all expert testimony is reliable. To paraphrase from Goffredo v. Mercedes-Benz Truck Co., Inc., 402 Mass. 97, 104 (1988), when expert opinion (about the cause of a truck’s door latch failure) is not sought until four-and-a-half years after the accident — *143 here the time lag was about four years — and is based in part on assumptions as to force and distance the expert could not measure — only that they were “sufficient” to cause the truck door to open — it is inadequate to establish breach of warranty.
In the circumstances of this case, if Azar’s opinion is read as implying that the handlebar stem failure resulted from one or more foreseeable events, we view it as deficient in detail as to how and why it occurred here. Goffredo v. Mercedes-Benz Truck Co., Inc., Id. See, too, Swartz v. General Motors Corp., 375 Mass. 628, 632-633 (1978) (expert’s testimony deficient since based on speculation, there having been no test of amount of force required to “unstick” detent switch).
Accordingly, HKK’s Report is allowed[5] and judgment is to enter for third-party defendant, HKK.[6]

 As authorized by applicable appellate rules, not all the evidence is reported. Dist./ Mun. Cts. R. A. D. A., Rule 8C(d), “If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence ..., he or she shall include in the record a transcript of all evidence relevant to such finding or conclusion.” The same rule gives appellee ten days to file and serve on appellant a designation of additional parts to be included. Accordingly, we presume that all evidence introduced at trial relevant to either side’s claim is before us.

 The answer to “how else could it have happened?” sometimes allows the fact-finder to infer negligence and causation from circumstantial evidence on the now no-longer favored legal principle res ipsa loquitur (the thing speaks for itself). Evangelio v. Metropolitan Bottling Co., Inc., 339 Mass. 177 (1959) (can infer negligence without need for expert where beverage bottle exploded, injuring plaintiff’s hand). But negligence may be inferred from circumstantial evidence only if the instrumentality causing the accident was in the sole and exclusive control and management of defendant and the accident was of the kind or type that could not happen in the ordinary course of things unless there was negligence by the defendant. Wilson v. Honeywell, Inc., 409 Mass. 803, 806-807 (1991) (jury could conclude that defective garage door causing plaintiff’s injury was in control of defendant, that door more likely defective because of disrepair than because tampered with or improperly opened and that due to uncomplicated design of typical garage door reasonable inspection before accident would likely have revealed defects). Here, of course, the bicycle had long since left defendant’s control and the judge made no finding of defendant’s negligence.

 The other defendants against whom judgment entered have retransferred the case for a jury trial under the provisions of G.L.c. 231, §102C. We are advised that that case is awaiting trial. How the existence of this appeal and that case are eventually to be reconciled, we, fortunately, are not asked to resolve. Manifestly these convoluted and fractured proceedings, described as a Rube Goldberg device, do not best serve the courts’ or the parties’ needs. See, Bender v. Automotive Specialties, Inc., 407 Mass. 31, 35-36 (1990) (outlines how cases like this may be passed upon by as many as thirteen judges and a jury).

 It should come as no surprise that Bruno mentioned no crack. If she had, the question of what she did about it — clearly nothing — and her share of responsibility in the handlebar’s failure would have been at issue on her negligence claim. G.L.c. 231, §85 (Plaintiff is barred from recovery if her causal negligence exceeds the defendant’s negligence. If plaintiff’s negligence is 50% or less, her recovery is diminished accordingly). In addition, Azar, recall, is not her expert.

 In view of this result, we have no reason to consider HKK’s further claim on its indemnification agreement with Columbia.

 The Rube Goldberg mechanism of the remand-retransfer of cases is referred to earlier, in Footnote 3. With the allowance of HKK’s Report here, that mechanism is put to a severe test. After all, the parties here do not even include Bruno who was successful in the bench trial. Nor, because Bruno was not a party to this appeal, does it necessarily clear Columbia of the liability found against it in that trial. Again, we are grateful not to be responsible for sorting out the consequences of this decision on that retransfer.