Fremont-Smith, Thayer, J.
In this wrongful death action filed on behalf of the deceased, Robert Bourgeois (Bourgeois), by the administratrix of his estate, Bourgeois was employed as a laborer in the construction industry for P.J. Keating Company (Keating). He was killed on June 5, 2003, when he was run over by a large pavement milling machine when it was being operated in reverse.[1] It is not disputed that the machine had a “blind spot” which prevented an operator from observing a person standing behind the machine when it was going in reverse. The machine had been designed and manufactured by defendant Caterpillar, Inc. (Caterpillar), and sold by defendant Southworth-Milton, Inc. (Southworth). The Complaint makes allegations of negligence, gross negligence, and breach of warranty against both defendants. Caterpillar and Southworth have each moved for summary judgment on all counts.
In its opposition to defendants’ motions, Beauregard has submitted evidence tending to show that Caterpillar was aware of this blind spot when it was being operated in reverse but failed to adequately remedy or safeguard that defect.[2] An engineer,[3] opining on Beauregard’s behalf, has testified that safe, feasible control mechanisms, such as a closed-circuit television system (CCTV), could and should have been provided on the machine. To support plaintiffs claims for failure to adequately warn and instruct, plaintiff has also elicited deposition testimony from Bourgeois’s coworkers and from an application specialist for such machines whom Caterpillar had employed to train Keating employees, including Bourgeois, in regard to procedures for safely working in conjunction with the machine.[4] There is evidence that the machine operator was specifically instructed about the machine’s blind spot but that the crew members received only a general “safe distance” instruction regarding how far away from the machine they should stand when it was being operated in reverse. There is also evidence that the training did not address the visibility issues of the machine, that the machine did not feature any blind spot warning labels, and that the relevant warning labels used language referencing only those times when the machine was actually milling rather than when it was just traveling.
Plaintiff has also retained an accident reconstruction specialist[5] to address the key issue of causation. According to his affidavit, the blind spot “prevented the operator of the machine. .. from seeing Bourgeois in the moments before this accident,” and “reliance on visual and hand signals did not allow for the avoidance of sudden emergencies . . . where the operator was unable to keep the crew on the ground within his sight.”
Defendants argue that Murphy’s testimony on the cause of the accident is too speculative to withstand summary judgment. They emphasize that no one actually witnessed the accident, so that no one can testify to how Bourgeois came to be behind the machine or how long he was there. Furthermore, the accident happened so quickly (within five seconds) that the defendants contend it is a matter of conj ecture whether the operator could have avoided the accident even had he been able to view Bourgeois behind the machine. In response to plaintiffs failure to warn claim, defendants also contend that Bourgeois’s actual knowledge of the machine’s blind spot eliminated any duty to warn.
The question before the Court on a motion for summary judgment is whether the evidence produced, viewed most favorably to the non-moving party, is sufficient to support the non-moving party’s claims. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Beauregard’s theory of causation rests almost exclusively on Murphy’s opinions and the statements of Bourgeois’s coworker[6] who was operating the machine at the time of the accident.
According to the operator’s statement, he had just completed a pass with the machine and was preparing to move it backwards to start the next pass. He made eye contact with Bourgeois, who was standing on the *42 ground outboard of the machine’s right side about ten to fifteen feet, and about twenty-five to thirty feet behind. Eventually, Bourgeois gave the operator the signal that he could back up safely by nodding his head and motioning his arm. The operator then shifted the machine into high gear, walked from the right side of the platform to the left, and then back to the right. He made eye contact with Bourgeois again, and Bourgeois signaled that it was still safe to reverse direction and change lanes. He then moved to the steering wheel on the left side of the machine, and he turned the wheel thus setting the machine in motion in a different (diagonal) direction, simultaneously backwards and into the right lane. After moving an estimated twenty to forty feet, he heard yells to stop. He took the throttle down to stop the machine, walked over to the right side of the platform, and saw Bourgeois’s legs sticking out from under the machine. He then hit the kill switch.
Bourgeois was run over by the machine’s rear right track. Based on the operator’s testimony and the expert’s accident reconstruction, plaintiff argues that changing the machine’s direction abruptly in reverse shifted Bourgeois into the operator’s blind spot. As a result, the operator lost sight of Bourgeois as he maneuvered the machine. Because he could not see that Bourgeois was in danger as the machine moved backwards, the blind spot resulted in the accident.
At the hearing on defendants’ summary judgment motion and in their briefs, the parties have focused on plaintiffs contention that a CCTV system would have probably prevented the accident. In his report, the expert found that a CCTV system would have reduced the blind spot by over eighty percent.[7] Furthermore, he opines that “the utilization of a CCTV system would have allowed the operator to view Bourgeois in the position he was in prior to this incident and it would have prevented the accident.”
Caterpillar, moreover did install CCTV systems in its machines of this type after Bourgeois was killed, a fact which is admissible to prove the practical feasibility of such installation. Simmons v. Monarch Mach. Tool Co., 413 Mass. 205, 214 (1992).[8] When deposed, however, plaintiffs expert admitted that there was no way to predict whether the operator, even with the benefit of a CCTV monitor, would have observed Bourgeois with enough time to stop the machine.
Whether a CCTV system would probably have allowed the operator to see Bourgeois before he was run over, and whether the CCTV system would probably have prevented Bourgeois from being run over, are, of course, two distinct questions. The first question is one of liability, i.e., whether Beauregard has demonstrated, on the summary judgment record, that a jury would be warranted in concluding that it was more probable than not that the accident that killed Bourgeois was within the reasonably foreseeable risk of harm that resulted from Caterpillar’s failure to provide an available instrument to monitor its blind spot. According to the Supreme Judicial Court, whether a risk is foreseeable is almost always a question for the jury. Simmons v. Monarch Mach. Tool Co., Inc., supra. There is certainly enough evidence here for a juiy to conclude that the accident that killed Bourgeois was reasonably foreseeable so that Caterpillar was negligent. Not only was Caterpillar aware of the risks posed by the blind spot (it had recommended the installation of mirrors on all the machines in its Operator Visibility Memorandum in February 2002) but the nature of the work the machine performs and its sheer size, which requires that a ground crew work in close proximity around the machine even while it’s operating in reverse, create a foreseeable risk that someone standing in the blind spot could be injured or killed.
The second distinct question is one of proximate cause, i.e., whether, even had additional available safety devices been installed on the machine, the operator would have seen Bourgeois in time to avoid the accident. See Fund v. Hotel Lenox of Boston, Inc., 418 Mass. 191, 193 (1994). While a jury would certainly be warranted here in finding that Bourgeois’s accident was foreseeable and preventable so that Caterpillar was negligent, it would still need to determine whether the provision of additional safety equipment here probably would have prevented Bourgeois’s death in the particular circumstances. Beauregard’s accident reconstruction expert conceded at his deposition that a CCTV system could only have prevented the accident if it was utilized. The operator, moreover, admitted in his deposition that he did not consult the mirrors which were on the machine moments before Bourgeois was run over. It is thus unclear whether he would have taken advantage of any other view-enhancing device, such as a CCTV monitor, in time to avoid the accident.
Since the accident, Caterpillar has retrofitted its paving machines with a CCTV system that permits an operator to see behind the machine, thus evidencing its feasibility. However, while the operator admits it is now his usual practice to check whether anyone is positioned behind the machine before moving backward, he also acknowledged that he rarely uses the monitor once the machine is moving in reverse.
Nor is there any evidence that, even if the CCTV system been installed and the operator been watching it, it would have afforded him sufficient time to stop. The operator testified that only three to six seconds passed between the last moment he had visual contact with Bourgeois and the instant when he believes Bourgeois was caught under the right rear track of the machine. According to the expert testimony, his window of time was probably even smaller. The operator’s likely reaction time was one and a half seconds, the machine was moving at a speed about three feet per second, and the distance required to bring it to a full stop ranged from one to five feet. Because none of Bourgeois’s coworkers actually witnessed the acci *43 dent, the jury will hear no evidence concerning when or how Bourgeois came to be in the path of the machine or how long he was there. Therefore, a jury could only speculate as to whether the operator had sufficient time to stop the machine safely even if he had been watching a CCTV screen.
Beauregard’s argument therefore reduces to the possibility that a CCTV system would have captured Bourgeois’s image in time for the operator to stop the machine safely and that the operator would have been paying attention and done so.[9] Drawing all reasonable inferences from the evidence in Beauregard’s favor, a jury could conclude only that a CCTV system possibly, but not probably, would have prevented the accident that killed Bourgeois. Causation framed in terms of possibilities does not establish, by a preponderance of the evidence, the existence of a design defect that caused an injuiy. See Goffredo v. Mercedes-Benz Truck Co., 402 Mass. 97, 102-03 (1988) (holding that a directed verdict in defendant’s favor was appropriate where plaintiff s expert was able to state his opinion regarding the cause of plaintiffs injuries only in terms of possibility but not of probability). Sweeting v. Cairns & Brother, Inc., 32 Mass.App.Ct. 27, 29 (1992). Cf. Fund v. Hotel Lenox of Boston, 418 Mass. 191 (1994).
Because plaintiff has demonstrated no likelihood of being able to satisfy her burden of proof with respect to causation, summary judgment in favor of defendants is appropriate on Counts I, III, IV, and VI (negligence and gross negligence) insofar as they relate to Beauregard’s claim for defective design. Summary judgment is also appropriate on Counts II and V (breach of warranty).
Caterpillar and Southworth, however, may have been negligent in another way. Generally, a manufacturer’s duty of care also includes an obligation to warn of known or reasonably knowable dangers inherent in the intended and foreseeable use of a product. Welch v. Keene Corp., 31 Mass.App.Ct. 157, 161 (1991).
Although it is also well settled that a duty to warn does not attach where the danger presented is obvious, see Bavuso v. Caterpillar Indus., Inc., 408 Mass. 694, 699 (1990), or where the plaintiff appreciates a danger substantially to the same extent as a warning would have provided, Carey v. Lynn Ladder & Scaffolding Co., Inc., 427 Mass. 1003, 1004 (1998), this is not clearly the case here.
According to the un-rebutted testimony of a member of the milling crew with Bourgeois,[10] he and Bourgeois had multiple discussions about the machine’s blind spot and the need to be cautious when working around the machine. The operator also claims that Bourgeois told him during his training that “it could be dangerous if you were out of the operator’s view.” There are various other undisputed accounts tending to show that Bourgeois was probably generally aware of the machine’s blind spot, or, at the very least, the importance of staying within the operator’s line of sight when working around the heavy machinery. Nevertheless, the employee whom Caterpillar employed to train the crew,[11] stated that he instructed the ground crew, when the machine was in operation, only to maintain a “safe distance," and when questioned at his deposition about what he considered to be a safe distance, he answered that he believed it was as little as two to three feet in some circumstances. This could be viewed by a jury as inadequate instruction as to the danger comprising negligence in view of his knowledge that the operator’s common practice was abruptly to change direction when the machine was operated in reverse.
It is thus not clear beyond dispute that Beauregard’s general knowledge of the danger here was detailed enough or complete enough to be “obvious”, so as to have obviated defendants’ duty to warn. See Bavuso v. Caterpillar Indus., Inc., supra. Moreover, although no Massachusetts Court appears to have extended a manufacturer’s or dealer’s “duty to warn” to include a “duty to train,” here Caterpillar and Southworth affirmatively undertook the additional task of “training” P.J. Keating Co. employees, creating an additional duty of due care.[12]
In sum, viewing the evidence in the light most favorable to Beauregard, Bourgeois may not have been fully informed of the danger and, having been trained to work in close proximity to the machine, he may not have been told to take adequate precautions in view of the machine’s likelihood to abruptly change direction while being operated in reverse. In the Court’s view, a trial is required to ascertain whether the evidence will be adequate to permit a jury reasonably to find that defendants failed to adequately warn or to adequately train him and whether any such failure was a proximate cause of plaintiffs death.
Accordingly, the Court concludes that defendants are not entitled to summary judgment on plaintiffs failure to warn claims set forth in Counts I, III, IV and VI (negligence and gross negligence).
ORDER
For the reasons stated above, defendants’ motions for summay judgment are ALLOWED, as to Counts I, III, IV and VI of the complaint insofar as they allege defective design, and as to Counts II and V (breach of warranty).
The motions are DENIED as to Counts I, III, IV and VI insofar as they relate to defendant’s alleged failure to warn.

 The machine, referred to as a “cold planer," grinds and removes the top layer of asphalt on a road in preparation for the road’s resurfacing.

 Beauregard relies on a document entitled “Caterpillar Operator Visibility Memorandum,” published on February 15, 2002, in which Caterpillar decided against installing rear mirrors on such machines despite acknowledging the existence of a blind spot.

 Darry Robert Holt.

 Chuck Dault.

 Gerard D. Murphy.

 Michael McDonald.

 He concluded that under normal circumstances the paver’s blind spot extended thirty feet rearwards. A CCTV camera mounted on the back of the machine revealed twenty-five feet of the previously invisible area (83%).

 In addition to a CCTV system, an expert for the plaintiff (Holt) has identified several other devices which would probably have prevented Bourgeois from being run over by the machine. An engineer retained by plaintiff categorized these concepts generally as “presence-sensing devices.” For instance, one such device would consist of two bars, equipped with laser diodes or some other light source, protruding from the rear corners of the machine. The bars would create a laser field behind the cold planer, which, if broken, would automatically stop the machine. The problem is that, unlike the CCTV system, the feasibility of integrating these devices into the machine’s cannot be shown, as the expert concedes there has been no kind of evaluation, study, testing or analysis of any of those “presence-sensing devices.”

 The operator himself and his employer are, of course, immunized from suit by the Workers’ Compensation statute.

 Matthew Stanton.

 Chuck Dault.

 Southworth employee Jeny Shanahan contacted Caterpillar and scheduled the training and demonstration session for the P.J. Keating Co. crew shortly after Southworth sold Keating the machine in spring 2003. Both Shanahan and Dault were present at the training on April 29, 2003, to instruct the crew on the safe and proper procedures while working in conj unction with the recently purchased machine.